William B. Federman, Esq. (OK SBN 2853)
Joshua D. Wells, Esq.(OK SBN 22334)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73008
Phone: 405.235.1560
Fax: 405.239.2112
wbf@federmanlaw.com
jdw@federmanlaw.com

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
BAKER & McKENZIE LLP
12544 High Bluff Drive, Third Floor
San Diego, CA  92130-3051
Telephone:  +1 858 523 6200
Facsimile:  +1 858 259 8290
Email:  Ali.Mojdehi@bakermckenzie.com
Email:  Janet.Gertz@bakermckenzie.com

Attorneys for Plaintiff
John T. Hardisty

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John T. Hardisty,<br><br>        Plaintiff,<br><br>        v.<br><br>Harold Maxine Moore; Elaine K. Moore (aka Melanie K. Moore); State Insulation, Inc. an Arizona limited liability company; The 1998 Harold M. Moore Revocable Trust; and Mark Peluso,<br><br>        Defendants. | Case No.  3:11-cv-01591-AJB-BLM<br><br>Hon. Anthony J. Battaglia<br><br>**RESPONSE IN OBJECTION TO DEFENDANTS MELANIE MOORE AND MARK PELUSO'S MOTION TO DISMISS** |

Federman & Sherwood
10205 North Pennsylvania
Oklahoma City, Oklahoma
73120
+1 405 788 6308

Case No 3:11CV01591

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**INTRODUCTION**............................................................................................. 1

**ARGUMENT AND AUTHORITIES**.............................................................. 3

    I.    **Plaintiff Has Stated a Claim for Aiding and Abetting Breach of Fiduciary Duty**............ 3

    II.   **Plaintiff Has Stated a Valid RICO Claim**......................................... 8

**CONCLUSION** ................................................................................................ 16

Federman & Sherwood
10205 North Pennsylvania
Oklahoma City, Oklahoma
73120
+1 405 788 6308

i

# TABLE OF AUTHORITES

**CASES**

*Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ....................... 3

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ............................................................................................................................... 3

*California Pharmacy Management v. Redwood and Casualty Insurance Company,* 2009 WL 3514571, *9 (C.D. Cal. 2009)....................................................... 4, 7, 13, 16, 17, 18

*Feinberg v. Central Asia Capital Corporation, Limited,* 974 F. Supp. 822, 854 (E.D. Penn. 1997) ................................................................................................................. 16

*H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) .................................................................................................. 13, 14

*Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.,* 833 F.2d 1360 (9th Cir. 1988) ................................................................................................... 13, 16

*Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4th 257, 272, fn. 6 (2003) ................. 4

*Tabas v. Tabas,* 47 F.3d 1280 (3rd Cir. 1995) .......................................................... 13, 14, 16

*Uniroyal Goodrich Tire Company v. Mutual Trading Corporation,* 63 F.3d 516, 526 (7th Cir. 1995) .......................................................................................................... 16

*United States v. Grissom,* 44 F.3d 1507 (10th Cir. 1995) ............................................................ 8

*United States v. Krilich,* 159 F.3d 1020 (7th Cir. 1998) ............................................................. 8

*United States v. McGee,* 831 F.2d 670 (6th Cir. 1987).............................................................. 8

*Vai v. Bank of America,* 56 Cal.2d 329, 338 (1961) ............................................................. 4

*Wade v. Gaither,* 623 F. Supp.2d 1277, 1288 (D. Utah 2009) ................................................. 16

**STATUTES**

12 U.S.C. 17151(d)(3) and (d)(4) ................................................................................................. 1

18 U.S.C. 1014 ............................................................................................................................. 8

18 U.S.C. 1344............................................................................................................................. 8

Plaintiff John T. Hardisty hereby files his Response in Objection to Defendants Elaine K. Moore, aka Melanie K. Moore, and Mark Peluso's Motion to Dismiss (the "Motion") the second and fifth causes of action asserted in Plaintiff's Amended Complaint.  For the reasons that follow, Defendants' Motion should be denied in its entirety and the case should be allowed to proceed to discovery and a determination on the merits.  In support of this response, Plaintiff shows the Court as follows:

## INTRODUCTION

Plaintiff's Amended Complaint details the facts of a massive and systemic financial fraud that was effected by the Defendants against Plaintiff and others during the course of the construction of an apartment project funded by means of a loan offered and insured by the Department of Housing and Urban Development ("HUD"), pursuant to the HUD section 221(d)(4) program authorized by the National Housing Act (12 U.S.C. 17151(d)(3) and (d)(4)).  Defendant Harold Maxine ("Hal") Moore was one of four partners in a business venture, Legacy Pointe, LLC ("Legacy Pointe") a Tennessee limited liability company, which held title to the real property and otherwise entered into the financing covenants with HUD and the HUD lender relating to the construction of the HUD-financed project located in Knoxville, Tennessee.

Under the terms of the HUD-financed loan, both Legacy Pointe (as the project owner) and its members agreed to abide by specific HUD-required terms and conditions for the construction and financing of the project.  Also under the terms of the HUD-financed loan, Plaintiff was to perform services as the developer and general contractor on the project.  In lieu of receiving the normal profit from taking on these roles and responsibilities, Plaintiff was to receive a substantial equity ownership in Legacy Poitne, which held title to the real property.  Defendant Hal Moore, who had been a long-time trusted friend and mentor of Plaintiff's, expressed an interest in the project and ultimately became a member in Legacy Pointe, ostensibly as a passive investor.  However, from the

1

Federman & Sherwood
10205 North Pennsylvania
Oklahoma City, Oklahoma
73120
+1 405 788 6308

Case No 3:11CV01591

inception of his involvement in Legacy Pointe, and unbeknownst to Plaintiff, Defendant Hal Moore – along with the other co-conspirator Defendants, was secretly plotting to defraud Plaintiff and commit financial fraud against not only Plaintiff, but also as against the lender, HUD, and the company providing the payment bond and the performance bond in connection with the project and the HUD insured loan, in order to achieve Defendant's objective squeezing Plaintiff out of a viable project and of obtaining Plaintiff's ownership position in Legacy Pointe, for himself.  To this end, Hal Moore was aided and abetted by his co-conspirator wife, Defendant Melanie Moore and staff accountant, Defendant Mark Peluso.

As set forth in the Amended Complaint, Hal Moore committed numerous fraudulent acts in pursuit of his goal, including, *inter alia,* tricking Plaintiff into executing notes containing undisclosed dragnet clauses that placed liens on Plaintiff's personal residences and business properties, causing the Legacy Pointe project to far exceed the defined project scope and budget while promising to pay for these "extras" himself.  Then, contrary to Hal Moore's representations to Plaintiff that he would pay for the out of scope expenses, Hal Moore instead attempted to shift the liability for these extras to Plaintiff, to the detriment of Plaintiff's equity interest.  Then, in a further fraud to attempt to avoid having to pay for the extras, Hal Moore, along with his co-conspirators, structured a fraudulent scheme to and purchase excess unpaid sub-contractor claims of approximately $2.2 million through a shill entity, which was created specifically for the purpose of effecting the scheme.  Defendants then falsely represented to HUD, inc connection with the closing of the "take out" financing for the project, that these excess claims had been paid in full, and that there were no claims against the Project, other than as had been specifically disclosed.  Shortly after having made these false representations to HUD, the Defendants proceeded to assert the undisclosed excess claims on behalf of the shill entity against the performance bond, which had been obtained in

Federman & Sherwood
Oklahoma City, Oklahoma

part by Plaintiff's pledge of his separate property. At the same time, Hal Moore is also currently seeking to foreclose on Plaintiff's personal residences and business properties.

As a result of Hal Moore's fraud, in which he was materially assisted by Melanie Moore and Mark Peluso, Plaintiff Hardisty has lost his equity interest in the Legacy Pointe project, his businesses have been ruined and his credit and access to capital have been destroyed, while Defendants are now in a position to reap the profits from the operations of Legacy Pointe.

## ARGUMENT AND AUTHORITIES

### Standard of Review

In order to withstand a motion to dismiss, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The complaint need not state detailed factual allegations, but must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint does not suffice if it merely sets forth "naked assertions devoid of further factual enhancements." *Iqbal,* 129 S.Ct. at 1949. There can be no serious question that the extensive factual recitations in Plaintiff's Amended Complaint satisfy this pleading standard and the Defendants' Motion should be denied.

**I.    Plaintiff Has Stated a Claim for Aiding and Abetting Breach of Fiduciary Duty**

Defendants Melanie Moore and Mark Peluso first assert that Plaintiff's cause of action against them for aiding and abetting breach of fiduciary duty fails to state a claim because there is no underlying fiduciary relationship between Plaintiff and Defendant Hal Moore in the first instance. Defendants base this contention on the fact that the Operating Agreement for Legacy Pointe Apartments LLC, in which Plaintiff and Hal Moore were both members, provides that it is to be construed under the laws of the State of Tennessee. Defendants argue that, under Tennessee law,

Federman & Sherwood
Oklahoma City, Oklahoma

members of an LLC do not stand in a fiduciary relationship with regard to each other and accordingly owe no fiduciary obligations.

However, even assuming Defendants are correct as to that limited issue, it still misses the point.  This is because Defendants' reading of Plaintiff's Amended Complaint is far too narrow, as Plaintiff has alleged a fiduciary or confidential relationship under California common law, arising out of a special confidential relationship that existed between Plaintiff and Hal Moore:

> The prerequisite of a confidential relationship is the reposing of trust and confidence by one person in another who is cognizant of this fact.  The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another.  It is evident that while these two relationships may exist simultaneously, they do not necessarily do so…The simultaneous existence of a confidential relationship based on trust and confidence and a fiduciary relationship arising out of control of property of another is readily apparent in many common associations principal and agent, attorney and client, business partners, to name a few.

*Vai v. Bank of America,* 56 Cal.2d 329, 338 (1961).  "The existence of a confidential relationship is a question of fact, and the question is only whether the person actually reposed such trust and confidence in the other, and whether the other accepted the relationship.  A relationship must exist over a period of time."  *Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4th 257, 272, fn. 6 (2003).

Under the above definitions, Plaintiff has clearly set forth sufficient facts to establish a fiduciary or confidential relationship.  The Amended Complaint states in part as follows:

10.     Plaintiff Hardisty had known Defendant Hal Moore for at least 25 years prior to the acts complained on in this Complaint.  Plaintiff Hardisty viewed Defendant Hal Moore as a very close friend and mentor in the construction industry.  Defendant Hal Moore had hired Plaintiff early in Plaintiff's career having helped launch Plaintiff's career in the construction business.  Plaintiff viewed Defendant Hal Moore not only as a close personal friend, but also as something close to a father figure.  As a result,

Plaintiff often sought Defendant Hal Moore's advice and guidance on various business and personal matters.

11.     The Moore Defendants each had special access to Plaintiff's personal financial affairs by virtue of the close and confidential relationship and friendship that had developed between them over many years.  Based upon the trust Plaintiff placed in Defendant Hal Moore as a result of their longstanding friendship, Plaintiff frequently confided in Defendant Hal Moore, seeking out Defendant Hal Moore's advice on financial matters and frequently shared his personal financial information with Defendant Hal Moore in connection with obtaining such advice.  In light of their longstanding close friendship and confidential relationship, Plaintiff trusted Defendant Hal Moore implicitly with this information, placing his trust in Defendant Moore, believing that he would never use the information for an improper purpose or to harm Plaintiff.  Plaintiff Hardisty also believed that Defendant Hal Moore would return the trust Plaintiff had placed in him by dealing honestly and in good faith with Plaintiff.  As a result, Plaintiff let his guard down when transacting business with Defendant Hal Moore, believing that their close personal bond and the trust he had in Defendant Hal Moore's good faith and loyalty eliminated the need to seek the advice and counsel of an attorney in connection with his dealings with Defendant Hal Moore.

12.     In or about 2004, Plaintiff experienced financial difficulties as a result of an employee of one of his businesses and, ultimately, as the result of a lawsuit filed by that employee.  In 2004, a former employee of Defendant Hal Moore, who was subsequently hired by Plaintiff, embezzled a large amount of funds from Plaintiff's drywall business.  The Employee was fired, and the subsequent litigation between

Plaintiff and this Employee placed Plaintiff's business operations under great financial strain.  Due to the fact that this employee had formerly been employed by Defendant Hal Moore, Defendant Hal Moore knew about the lawsuit and the financial stress it placed upon Plaintiff.  Defendant Hal Moore called Plaintiff and told him to come to Defendant Hal Moore's office.  At that time, Defendant Hal Moore stated to Plaintiff that he had heard Plaintiff was having some serious financial difficulties.  Defendant Hal Moore assured Plaintiff that Defendant had experience as an accountant and could "help" Plaintiff.  Defendant Hal Moore then, in a confidential manner, instructed Plaintiff to tell him everything about his financial affairs, the size and extent of his assets, and all the details about the litigation, which Defendant promised to hold in absolute confidence.  After receiving the confidential details regarding Plaintiff's finances, Defendant Hal Moore, stating that he wanted to "help" Plaintiff, handed Plaintiff a check for $75,000, and instructed Plaintiff to go to City National Bank, to a designated employee at City National Bank, who was to deposit into an account for Plaintiff.  Plaintiff accepted the money and did as he was instructed with the check.

13.    After having made the deposit of the $75,000, Defendant Hal Moore subsequently loaned Plaintiff additional amounts in connection with the litigation concerning the former employee, up to the amount of approximately $1.1 million.  Then, Defendant Hal Moore informed Plaintiff that the money was a "loan" and that he would require Plaintiff to execute a note that would be secured by certain vacation property owned by Plaintiff.  Defendant Hal Moore also stated that Plaintiff would be required to provide Defendant Hal Moore with detailed information on Plaintiff's open jobs and accounts payable, which information was to be updated by Plaintiff

6

regularly.   At all times relevant to this Complaint, Plaintiff continued to provide regular updates concerning the confidential details of his financial affairs to Defendant Hal Moore.

14.     As a result, the Moore Defendants began to have even more comprehensive access to Plaintiff's personal and confidential financial information, as well as the confidential financial information of each of Plaintiff's businesses.

[Amended Complaint, ¶¶ 10-14].

Plaintiff has thus alleged all of the elements necessary to establish a fiduciary or confidential relationship under California law, irrespective of the Operating Agreement.  Over the course of their lengthy relationship, Plaintiff obviously "reposed trust and confidence" in Hal Moore and Hal Moore encouraged him to do so, helping him with advice and mentoring as Plaintiff began his career in the construction industry.  Plaintiff relied on Hal Moore's experience to such an extent that he revealed all of his personal and business financial information to him, enabling Hal Moore to abuse the relationship and effectively take control of Plaintiff's finances.   The facts of this case are that Plaintiff and Hal Moore are not equals.  While Hal Moore is and has long been a very sophisticated businessman, Plaintiff is a construction worker who has been successful with a number of projects, but who has no particular business expertise.   Plaintiff was clearly the weaker party in this relationship and vulnerable to manipulation by Hal Moore, who clearly must be considered a fiduciary with regard to Plaintiff.

As Melanie Moore and Peluso's only basis to dismiss Plaintiff's claim for aiding and abetting a breach of fiduciary duty was the lack of an underlying fiduciary or confidential relationship, their Motion must be denied.  As they tacitly concede, the Amended Complaint contains the requisite factual allegations for an aiding and abetting claim, and this Court should so hold.

## II.    Plaintiff Has Stated a Valid RICO Claim

Defendants Melanie Moore and Peluso next argue that Plaintiff's RICO claim should be dismissed because "a plaintiff must generally plead and prove more than one scheme with one victim." [Defendants' Memorandum at 13]. As an initial matter, it should be noted that Plaintiff's Amended Complaint indicates that there are at least seven victims of Defendants' fraudulent scheme: Plaintiff Hardisty himself; the entity Munson-Hardisty LLC ("M-H"), the general contractor and builder of the Legacy Pointe project; John Munson, co-owner of M-H with Plaintiff Hardisty; HUD, Wells Fargo, the construction lender; and Great American Insurance Company, the company that provided the payment and performance bonds. In addition, Legacy Pointe itself was a victim of the Defendants' wrongdoing.[1]

For example, the Amended Complaint states as follows:

83.    Upon Hal Moore's receipt of his membership interests in Company, however, Defendant Hal Moore demanded that Plaintiff would commence monthly payments to Defendant Hal Moore of a 13 percent preferred "return" on Defendant's "investment." Defendant Hal Moore knew that the HUD Regulatory Agreement and the Operating Agreement approved by HUD did not allow the payment of such amounts to him, which amounted to distributions from the Company. As such, Defendant Hal Moore made demands on Plaintiff to cause M-H to pay Defendant Hal Moore a "management fee" in this same amount (that is, $20,000 per month), which Defendant Hal Moore demanded to be paid from the M-H's allocated General Requirements and Overhead—which funds were otherwise needed by M-H to

---

[1] Defendants' financial fraud against both Plaintiff and HUD are not garden variety tortious acts, rather under 18 U.S.C. 1344 and 18 U.S.C. 1014 they are elements of a criminal scheme which may be alleged in terms of mail or wire fraud. *See, e.g., United States v. Grissom*, 44 F.3d 1507 (10th Cir. 1995), *United States v. McGee*, 831 F.2d 670 (6th Cir. 1987); and *United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998).

properly staff the Project and to pay for operating expenses.  In this way, Defendant Hal Moore improperly and fraudulently diverted at least $300,000 from M-H—that is, a substantial portion of the loan funds that were otherwise designated by HUD for payment M-H's overhead and expenses as general contractor the Project.  Indeed, Defendant Hal Moore expressly dictated what Defendant referred to as the "Hal Money" was to be paid to him *out of M-H's HUD loan funds*.  In so doing, Defendant Hal Moore harmed not only the Project, but in a grossly negligent and malicious manner, also harmed M-H, and thereby harmed Plaintiff, by destroying M-H's ability to staff the Project with the necessary personnel.

91.     As another example of the expenses that were improperly shifted to M-H, several of the subcontractors on the Project were stealing materials from the Project, aided and abetted by a temporary employee working at M-H.  M-H thus had to incur significant additional expenses for replacement materials, which amounts could not be charged to the HUD loan.  Nonetheless, Defendant Hal Moore (through his control of the Company) refused to allow an insurance claim to be made by the Company.  Defendant Hal Moore refused to authorize the submission of a claim to the insurance provider, because he did not want the Company's premium to increase.  As such, he left M-H unjustly saddled with the expense.  Then, to add insult to injury, Defendant Hal Moore refused to permit the labor center's (Skyco Staffing) invoice for the temporary employee's services to be paid.  Skyco Staffing then sued M-H and the Company.  Defendant Hal Moore, rather than acting in good faith, cut a side deal with Skyco, leaving M-H to be left to litigate the lawsuit and to pay the legal expenses, although it had been Defendant Hal Moore's actions that caused the suit in the first

place.  This only placed further financial pressure on M-H, improperly draining it of funds needed to complete the Project.

97.     Under the defined Change Order process under the construction loan, the Company was required to prepay the cost of all change orders and to deposit the additional funds with HUD during the duration of the Project.  Then, upon the ultimate refinancing of the Project, the Change Orders would be evaluated by HUD and the lender against the loan to value ratio to determine whether and to what extent the take out financing might be increased to cover the additional costs.  The Moore Defendants did not want to bear this risk and otherwise did not want to have to deposit the cash with the lender to cover the extras that Defendant Hal Moore was incurring on the Project.  Defendant Hal Moore instead fraudulently and maliciously shifted this risk to Plaintiff and M-H, intending all the while to leave Plaintiff and M-H holding the bag.  In the meantime, the Moore Defendants and Peluso caused the payments to the subcontractors to be delayed, short paid, or unpaid entirely.  This, in turn, ruined the morale of the subcontractors and also destroyed the ability of M-H to keep the Project running on schedule, subjecting M-H and Plaintiff to the risk of liquidated damages.  Defendant Hal Moore did not want any change orders to be submitted by the Company because Defendant Hal Moore found it more convenient to place M-H and Plaintiff at risk, and to keep the subcontractors unpaid for their materials and labor.

119.    But the Moore Defendants were not content with simply extorting Plaintiff's and M-H's investments in the Company.  Unbeknownst to Plaintiff at that time, the Moore Defendants also incorporated a fraudulent scheme to hold Plaintiff personally liable for the extra charges Defendant Hal Moore had caused to be incurred in

10

connection with the Project.  The Moore Defendants launched a scheme under which they would set up a shill entity to purchase the claims of subcontractors and then to file fraudulent claims against the payment and/or performance bonds, hoping to deceive the bonding company into making payment for the "extra" work that Defendant Hal Moore had incurred in connection with the Project, and later to pursue Plaintiff under the indemnification provisions of the bonds.  The Defendants intended thereby to not only defraud Great American, but knew that their scheme would also trigger liability by Plaintiff to Great American, causing Plaintiff's financial ruin.

120.    The Moore Defendants' scheme required a byzantine structure to cover the Defendants' tracks and hide their intent from HUD, the HUD lender, and Great American.  The scheme required the use of Defendant State Insulation as a "straw man" entity through which to launder payment transactions and the proceeds of same.

137.    The PSA was crafted by the Moore Defendants for the specific purpose of deceiving HUD, to avoid the requirements under the HUD Regulatory Agreement that no distribution of assets or income of any kind of the Project may be made to an equity member of the Company.  Moreover, the Moore Defendants purposely hid from HUD under the PSA that the Company's assets had, in fact, been encumbered by Defendant Hal Moore because they knew that under HUD guidelines, no secondary financing or second mortgages could be placed upon the Company or the Project.

138.    Upon information and belief, the January 26, 2009 PSA was never at any time provided to HUD by Defendants Melanie Moore and Hal Moore.  Upon information and belief, Plaintiff's signature to the Purchase and Sale Agreement was procured by

the Moore Defendants instead for the sole purpose of effectuating their fraud and conspiracy against Plaintiff, M-H, Great American, and HUD.

154.    In connection with the loan closing, notwithstanding the fact that there were still past due bills in the amount of approximately $2.2 million still owed to contractors, Defendant Hal Moore executed a certification on behalf of the Company to HUD and to the HUD lender that no such amounts were owing.  In fact, Defendant Hal Moore expressly represented that the only amounts still due and owing were the approximately $535,000 in invoices, which would otherwise be paid in connection with the closing with funds in that same amount held by the title company, from the remaining proceeds of the HUD loan.  *See* Exhibit 6 (Certification).

155.    The closing of the HUD loan, which converted the loan from a construction loan to permanent "take out" financing, occurred on August 21, 2009.

156.    Defendant Hal Moore submitted a schedule of values that he had manipulated to match the remaining funds in the loan, stating by affidavit under penalty of perjury that excepting for the amounts that were disclosed on the schedule (i) that *all* payments had been made to M-H as was required under the Construction Contract; and (ii) that *all* subcontractors had been paid all amounts due for labor and materials provided in connection with the construction of the Project.  In fact, Defendant Hal Moore made these representations knowing that they were patently false and misleading.  Defendant Hal Moore knew that there were significant additional bills— at that time amounting to the approximate amount of $2.2 million—needing to be paid, which were not disclosed to HUD or the HUD lender by Defendant Hal Moore. Plaintiff, left the closing in protest and informed HUD and the title company that he objected to the representations.

[Amended Complaint at ¶¶ 82, 91, 97, 119, 120, 137, 138, 154, 155, 156].   As a result, while Hardisty is the only named Plaintiff in the caption of the case, the Defendants' contention that he was the only victim of the Moores and Peluso's scheme is simply incorrect.

In any event, the primary case relied on by Defendants in support of their argument on this issue, *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.,* 833 F.2d 1360 (9th Cir. 1988), was decided prior to the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), in which the Court further clarified the continuity prong of the RICO analysis.   In *H.J.,* the Court specifically held that RICO's pattern concept does not "require an allegation and proof of multiple schemes."   *Id.* at 232.   In so holding, the Court described continuity as "both a closed- and open-ended concept, referring to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."   *Id.* at 241.   A party may thus establish continuity as a closed-end concept by "proving a series of related predicates extending over a substantial period of time."   *Id.* at 242.

The Third Circuit subsequently applied the holding in *H.J.* to a factual scenario involving one RICO victim in *Tabas v. Tabas,* 47 F.3d 1280 (3rd Cir. 1995).   In *Tabas,* a family dispute, the district court granted the defendants' motion for summary judgment on the same grounds urged by Defendants Moore and Peluso.   The district court reasoned that:

> Plaintiffs' claims essentially allege one fraudulent scheme perpetrated against one victim by one perpetrator.   The gist of plaintiffs' complaint is that Daniel Tabas has failed to abide by the partnership agreement made with his brother, Charles, and that Daniel has employed various methods of trickery to cheat Charles' heirs of their fifty percent share of the business that Charles and Daniel built.   *The sole victim of this scheme is Charles Tabas's Estate.   The sole perpetrator is Daniel Tabas or individuals under his control.   No one else is affected....* The partnership between Charles and Daniel is currently in the process of liquidation.   All of the fraudulent activity alleged in this suit will cease once the liquidation process is complete.

*Id.* at 1298-1299 (internal quotations omitted) (emphasis added).

The Third Circuit reversed the district court on the basis of the holding in *H.J.,* and found that the *Tabas* defendants' activities in furtherance of their purported scheme, which spanned a time period of over three years, was sufficient to constitute "the type of long-term criminal conduct that RICO was designed to address."  *Id.* at 1297.  The Appellate Court also cited with approval other cases holding that the durational aspect of the continuity requirement was satisfied by a fourteen month and a nineteen month period of racketeering activity, but that any period of less than twelve months would likely not be sufficient.

The parallels between *Tabas* and the case at bar are obvious and the same result should obtain, even assuming Plaintiff Hardisty is deemed to be the sole victim of the Defendants' scheme.  As set forth in the Amended Complaint, the racketeering activities began, at the latest, in approximately August, 2007, when Hal Moore became involved in the Legacy Pointe project.[2]  The scheme continues to the present, as Hal Moore filed foreclosure proceedings on Plaintiff's vacation home in March, 2010, which proceeding is still ongoing.  The Amended Complaint also sets forth twelve separate predicate acts in furtherance of the scheme, even though only two are required.

270.    The Defendants' control over the enterprise was acquired through a pattern of racketeering activity.  Each of Defendants Hal Moore, Melanie Moore, the Trust, and State Insulation conspired to: (i) induce Plaintiff to execute the 2007 Note and Trust Deeds under false pretenses (ii) induce the Plaintiff to execute the $750,000 Note by fraudulent misrepresentations; (iii) illegally, and without Plaintiff's knowledge or permission, forged Plaintiff's signature in connection with numerous documents issued in Plaintiff's name as an authorized representative of M-H; (iv) issue threats of extortion causing Plaintiff to lose all profit that would otherwise have been due to

---

[2]      Arguably, the racketeering activities began as far back as 2004, when Hal Moore coerced Plaintiff into executing a note secured by a vacation property and gained access to Plaintiff's detailed financial information.  Moreover, the Defendants' fraudulent activities are still continuing.

14

Plaintiff and M-H for their role as General Contractor in the construction of the Project; (v) issue threats of extortion causing Plaintiff to forfeit his BSPRA equity contribution in the Company, which had been valued by HUD at approximately $2.085 million; (vi) issue threats of extortion to cause Plaintiff to forfeit more profit that would have accrued to M-H (BSPRA at 10 percent), along with the Builder's Overhead and Builder's General Requirements, which would amount to over $400,000; (vii) converting the approximately $380,000 that Plaintiff had deposited on behalf of MH in connection with its construction of the Project; (viii) obtaining for themselves the substantial advances of expenses made by MH on behalf of the Company in connection with the Project, which they left unreimbursed; (ix) issuing threats and extortion to Plaintiff to cause him to forfeit his membership interests in the Company to Defendant Hal Moore; (x) causing a fraudulent trust deed to be recorded on Plaintiff's home and business property, against which Defendant Hal Moore has asserted a "balloon payment" of $750,000; (xi) filing a frivolous Complaint against Great American in order to trigger an indemnity by Plaintiff in connection with the Payment Bond so as to cause Plaintiff financial harm; and (xii) using their close relationship with the President of City National Bank to cause City National Bank to oppress Plaintiff in connection with Plaintiff's lines of credit at City National Bank.

[Amended Complaint at ¶ 270]. As a result, there can be no serious dispute that Plaintiff Hardisty has stated a RICO claim against the Defendants.

In addition to *Tabas*, there are numerous other cases holding that a RICO claim may be appropriate in cases involving a single victim. *See, California Pharmacy Management v. Redwood and Casualty Insurance Company,* 2009 WL 3514571, *9 (C.D. Cal. 2009) (rejecting defendant's

attempt to rely on *Medallion* "for the proposition that wrongful mail communications cannot establish a pattern of racketeering activity when the communications were part of one scheme to inflict injury on one victim"); *Uniroyal Goodrich Tire Company v. Mutual Trading Corporation,* 63 F.3d 516, 526 (7th Cir. 1995) (holding that "the existence of a single victim does not preclude the existence of a pattern of racketeering activity"); *Feinberg v. Central Asia Capital Corporation, Limited,* 974 F. Supp. 822, 854 (E.D. Penn. 1997); *Wade v. Gaither,* 623 F. Supp.2d 1277, 1288 (D. Utah 2009) (holding that plaintiff's complaint against his former defense attorney "can be construed to plead at least two to three instances of extortion of a period of nearly twelve full months, which is sufficient to establish a closed-ended pattern of racketeering activity and allow this case to proceed").  Plaintiff has thus adequately stated a RICO claim and Defendants' assertions to the contrary should be disregarded by this Court.

## <u>CONCLUSION</u>

In light of the foregoing, Plaintiff John T. Hardisty respectfully asserts that he has stated claims for aiding and abetting breach of fiduciary duty and RICO that are more than sufficient to survive a 12(b)(6) motion.  Plaintiff thus requests that the Motion to Dismiss of Defendants Melanie Moore and Mark Peluso be denied in its entirety.

Federman & Sherwood
Oklahoma City, Oklahoma

Case No 3:11CV01591

Dated:  November 7, 2011     FEDERMAN & SHERWOOD


By: /s/ William B. Federman
   William B. Federman
   *Pro Hac Vice*
   10205 North Pennsylvania
   Oklahoma City, Oklahoma 73120
   Telephone: 405.235.1560
   Facsimile: 405.239.2112
   wbf@federmanlaw.com

   Ali M.M. Mojdehi
   Baker and Mackenzie
   12544 High Bluff Drive
   Third Floor
   San Diego, California 92130
   Telephone: 858.523.6200
   Facsimile: 858.259.8290
   ali.mojdehi@bakermckenzie.com

   Attorneys for Plaintiff

17

**CERTIFICATE OF SERVICE**

I, William B. Federman, declare:

On November 7, 2011, I served the above pleading using the court's CM/ECF system pursuant to Local Rule.  The above pleadings were electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the person's listed below:

Gary Edward Scalabrini
Gibbs Giden Locher Turner & Senet LLP
1880 Century Park East
12th Floor
Los Angeles, California 90067-1621
Telephone: 310.552.3400
Facsimile: 310.552.0805
gscalabrini@gglts.com

Executed on November 7, 2011.

/s/ William B. Federman
William B. Federman
wbf@federmanlaw.com

Federman & Sherwood
Oklahoma City, Oklahoma

Case No 3:11CV01591