Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051
Telephone: +1 858 523 6200
Facsimile: +1 858 259 8290
Email: Ali.Mojdehi@bakermckenzie.com
Email: Janet.Gertz@bakermckenzie.com

William B. Federman, Esq. (OK SBN 2853)
Joshua D. Wells, Esq.(OK SBN 22334)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73008
Phone: 405.235.1560
Fax: 405.239.2112
WBF@federmanlaw.com
jdw@federmanlaw.com

Attorneys for Plaintiff
John T. Hardisty

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John T. Hardisty,<br><br>Plaintiff,<br><br>v.<br><br>Harold Maxine Moore; Elaine K. Moore (aka Melanie K. Moore); State Insulation, Inc. an Arizona limited liability company; The 1998 Harold M. Moore Revocable Trust; and Mark Peluso,<br><br>Defendants. | Case No. 3:11-cv-01591-AJB-BLM<br><br>Hon. Anthony J. Battaglia<br><br>**PLAINTIFF'S RESPONSE IN OBJECTION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

/ / /

/ / /

/ / /

/ / /

/ / /

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 2

II. ARGUMENT AND AUTHORITIES .......... 3

A. Standard of Review .......... 3

B. Plaintiff Has Stated a Valid RICO Claim .......... 3

1. Plaintiff Has Adequately Demonstrated Continuity—Under Both a Closed End and Open End Analysis .......... 4

a. Defendants' "Pattern" Analysis Fails to Distinguish Between an Open and Closed End Scheme .......... 5

b. A Pattern Exists Under a Closed-End Continuity Analysis .......... 5

c. Alternatively, a Pattern Exists Under an Open-End Continuity Analysis .......... 10

2. Defendants Misconstrue the Relevance of the Western Insulation Affair—Which Pertains to the Question of Continuity and the Inference of Future RICO Violating Conduct .......... 14

C. Plaintiff Has Properly Alleged a Claim of Abuse of Process .......... 16

D. Plaintiff's First Cause of Action Relates Back .......... 18

E. Plaintiff has Adequately Pled a Confidential Relationship .......... 19

F. Plaintiff's Cause of Action for Securities Fraud Is Not Barred by the Statute of Limitations .......... 21

III. CONCLUSION .......... 22




Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aagard v. Palomar Builders, Inc.*,
344 F.Supp.2d 1211 (E.D. Cal. 2004) .......... 20

*Allwaste, Inc. v. Hecht*,
65 F.3d 1523 (9th Cir. 1995) .......... 6, 10, 11, 12

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) .......... 3

*Bank of America v. Sanchez*,
3 Cal.App.2d 238 (1934) .......... 19

*Barquis v. Merchants Collection Assoc. of Oakland, Inc.*,
7 Cal. 3d 94 (1972) .......... 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) .......... 3

*Boyd v. Bevilacqua*,
247 Cal. App. 2d 272 (1966) .......... 20, 21

*Deveny v. Entropin, Inc.*,
139 Cal. App. 4th 408 (2006) .......... 21

*Drum v. Bleau, Fox & Assocs.*,
107 Cal. App. 4th 1009 (2003) .......... 17

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
48 F.3d 1260 (D.C. Cir. 1995) .......... 6, 9, 13, 16

*Estate of Arbuckle*,
98 Cal. App. 2d 562 (1950) .......... 19

*Fitzgerald v. Barnstable Sch. Comm.*,
555 U.S. 246 (2009) .......... 3

*Gagan v. Am. Cablevision, Inc.*,
77 F.3d 951 (7th Cir. 1996) .......... 9, 10

*Gibson v. Gov't Employees Ins. Co.*,
162 Cal. App. 3d 441 (1984) .......... 20

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
492 U.S. 229 (1989) .......... passim

# TABLE OF AUTHORITIES

**Page(s)**

*Ikuno v. Yip*,
912 F.2d 306 (9th Cir. 1990)........................................................................................... 6

*Johnson v. Riverside Healthcare System, LP*,
534 F.3d 1116 (9th Cir. 2008)......................................................................................... 3

*Kloehn v. Prendville*,
154 Cal. App. 2d 156 (1957)..........................................................................................19

*Kudokas v. Balkus*,
26 Cal. App. 3d 744 (1972)............................................................................................20

*Lerner v. Fleet Bank*,
318 F.3d 113 (2d Cir. 2003)........................................................................................... 9

*Medallion Television Enters., Inc. v. SelecTV*,
833 F.2d 1360 (1987) ..............................................................................................13, 14

*Michael Distributing Co. v. Tobin*,
225 Cal. App. 2d 655 (1964)..........................................................................................18

*Pointe San Diego Residential Community v. Procopio, Cory, Hargreaves & Savitch, LLP*,
195 Cal. App. 4th 265 (2011)..........................................................................................18

*Robbins v. Law*,
48 Cal.App. 555 (1920) ..................................................................................................19

*Sanders v. Sutton*,
40 Cal. 3d 607 (1985) .....................................................................................................19

*Schreiber Distrib. Co. v. Serv-Well Furniture Co. Inc.*,
806 F.2d 1393 (9th Cir. 1986)....................................................................................12, 13

*Sebastian Int'l, Inc. v. Russolillo*,
186 F. Supp. 2d 1055 (C.D. Cal. 2000) ..........................................................................10

*Sime v. Malouf*,
95 Cal. App. 2d 82 (1949) ..............................................................................................19

*Sun Sav. & Loan Ass'n v. Dierdorff*,
825 F.2d 187 (9th Cir. 1987)........................................................................................passim

*Templeton Feed & Grain v. Ralston Purina, Co.*,
69 Cal. 2d 461 (1968)..................................................................................................16, 17

# TABLE OF AUTHORITIES

**Page(s)**

*Ticor Title Ins. Co. v. Florida*,
937 F.2d 447 (9th Cir. 1991)....................11

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008)....................3

*Tyler v. Children's Home Society*,
29 Cal. App. 4th 511 (1994)....................19, 20, 21

*Vai v. Bank of America Nat'l Trust & Sav. Ass'n*,
56 Cal. 2d 329 (1961)....................20

*Western Insulation, L.P. v. Moore*,
2006 U.S. Dist. LEXIS 77065 (E.D. Va. Aug. 28, 2006)....................15

*Western Insulation, L.P. v. Moore*,
2008 U.S. Dist. LEXIS 4390 (E.D. Va. Jan. 22, 2008)....................16

*Younger v. Solomon*,
38 Cal. App. 3d 289 (1974)....................16, 17

**STATUTES**

18 U.S.C. § 1961 *et seq.*....................2

Cal. Civ. Code § 47....................17

Cal. Civ. Code § 1573....................19

Cal. Civ. Code, § 2219....................19

Cal. Corp. Code § 25506....................21

Fed. R. Civ. Proc. 12(b)(6)....................2, 3, 11

**OTHER AUTHORITIES**

1-4 *Civil RICO* ¶ 4.04[3] & n.36 (Matthew Bender & Co., Inc. 2011)....................6

Plaintiff John T. Hardisty hereby files his Response in Objection to Defendants' Motion to Dismiss (the "Motion") the first, fourth, fifth, seventh, and ninth causes of action asserted in Plaintiff's Second Amended Complaint. For the reasons that follow, Plaintiff Hardisty contends that the Motion should be denied in its entirety and the case should be allowed to proceed to a determination on the merits. In support of this response, Plaintiff shows the Court as follows:

## I. INTRODUCTION

The Defendants' Motion seeks to dismiss a number of the Plaintiff's claims in the Second Amended Complaint. As discussed below, each of the Plaintiff's claims have been adequately pled and should survive a motion to dismiss under the very deferential standard that applies under Fed. R. Civ. Proc. 12(b)(6).

In particular, the RICO cause of action, claim number five, has been adequately pled. The Defendants seek to challenge the RICO claim on the ground that the facts alleged lack the requisite "continuity." Stated in its most simple form, the Defendants seem to argue that because they are not engaged in schemes such as drug running, illegal gambling, and other well-known forms of "organized crime," that their actions are just a generic tort and thus should not incur the punitive remedies of RICO. But, what the Defendants forget is that their tactics, as such are alleged in the Second Amended Complaint—involving extortion, money laundering, false claims, financial institution fraud, and the like, are *also* the same *modus operandi* used by organized crime. RICO addresses criminal behavior, whether it is committed by a mob gangster or by your next-door neighbor. Indeed, just because a wolf smiles and appears in sheep's clothing, *i.e.*, a suit and tie, does not make the wolf less dangerous.

Furthermore, as discussed below, the Second Amended Complaint pleads facts that the Moore Defendants are recidivist in their conduct. In light of this, there is a strong suggestion that the Moore Defendants will, in the future, repeat similar criminal schemes—again and again—against unsuspecting victims.

As discussed below, the the RICO predicate acts pled by Plaintiff in the Second Amended Complaint demonstrate that the Defendants' conduct has the requisite continuity to establish the pattern element required to allege a violation under 18 U.S.C. § 1961 *et seq*.

## II. ARGUMENT AND AUTHORITIES

### A. Standard of Review

In order to withstand a motion to dismiss, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The complaint need not state detailed factual allegations, but must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint does not suffice if it merely sets forth "naked assertions devoid of further factual enhancements." *Iqbal*, 129 S.Ct. at 1949.

Equally important is the well known standard that a district court must construe the plaintiff's pleadings liberally in the plaintiff's favor. A district court presumes that all well-pleaded allegations are true, resolves all reasonable doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 249 (2009). Under the Supreme Court's teaching in *Twombly*, a plaintiff must, of course, allege facts that support an entitlement to relief, and such must appear affirmatively on the face of the pleading. *See Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1122 (9th Cir. 2008). No claim will be dismissed merely because the trial judge disbelieves the allegations or feels that recovery is remote or unlikely. *Twombly*, 550 U.S. at 555-56. Importantly, the burden of proof on a Rule 12(b)(6) motion lies with the moving party. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).

Here, as discussed below, the majority of the Defendants' arguments seem to be a thinly-veiled suggestion that the Court should engage in fact-finding or would otherwise construe facts against the Plaintiff contrary to the well-pleaded allegations in the Second Amended Complaint. But factual disputes may not be determined nor may evidence be weighed in connection with a motion brought under Rule 12(b)(6). The Defendants' invitation to the contrary should be rejected.

### B. Plaintiff Has Stated a Valid RICO Claim

The Defendants assert that, as to claim number five, the Complaint does not state a RICO claim because the Second Amended Complaint fails to plead a "pattern." The

Defendants base their assertion on the following two grounds: (i) that there is no "threat of continued activity" where the alleged object has been obtained, *i.e.*, Defendant Moore obtained Plaintiff's interest in Legacy Pointe and the Project; and (ii) because the Complaint pleads only "one scheme" injuring only "one victim."

As discussed below, the Defendants' arguments in this respect must be rejected on two grounds. First, contrary to the Defendants' oft-repeated theme, the Second Amended Complaint does not involve only "one victim." Rather, as alleged in the Second Amended Complaint, the Defendants' scheme has damaged numerous persons. Nor does the Defendants' scheme involve only one isolated transaction or event. The numerous predicate acts committed by the Defendants were neither unique nor isolated. Rather, the Defendants engaged in *multiple transactions* that each constituted separate RICO predicate acts. Likewise, the predicate acts alleged to have been committed by the Defendants were varied in their nature—including numerous acts of mail and wire fraud, extortion, financial institution fraud, money laundering, and false statements made to a financial institution to secure a loan—with each stemming from a different transaction or occurrence.

Second, the Plaintiffs' Second Amended Complaint alleges that the Defendants' conduct was a natural outcome of the Defendants' "regular way of doing business"—the same type of wrongful conduct that has been repeated again and again by the Defendants, and which can therefore be expected to reoccur in the future if not addressed by the punitive legal remedies provided under RICO.

### 1. Plaintiff Has Adequately Demonstrated Continuity—Under Both a Closed End and Open End Analysis

The Defendants incorrectly assert that the RICO claim should be dismissed because Plaintiff has pled no more than "one scheme with one victim." Motion at 9. First of all, there is no requirement that more than one "scheme" be involved. In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989), the Supreme Court unequivocally stated that evidence of multiple schemes ***is not required*** to establish a pattern. Nor, contrary to the Defendants' assertions, is there any requirement that more than one victim be involved. Indeed, the Ninth Circuit has found

continuity to be met where only a single victim is involved. *See, e.g., Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191-94 (9th Cir. 1987). As such, Defendants' contentions to the contrary must be rejected.

Rather, the focus of the continuity analysis is whether the predicate acts, as alleged, demonstrate <u>either</u> that the Defendants have engaged in ***continued criminal activity*** <u>or</u> that there is a strong likelihood that the alleged criminal activity will ***repeat*** itself in the future. If either is proved, a pattern will be established, even though the predicate acts may arise out of a single scheme and/or affect only a single victim. *H.J. Inc.*, 492 U.S. at 239.

**a. Defendants' "Pattern" Analysis Fails to Distinguish Between an Open and Closed End Scheme**

First of all, under the Supreme Court's decision in *H.J. Inc.*, it is necessary to analyze the continuity requirement differently depending upon whether the RICO scheme is "open end" or "closed end." In this respect, a RICO plaintiff must prove either "a series of related predicates extending over a substantial period of time," *i.e.*, ***closed-ended*** continuity, or "past conduct that by its nature projects into the future with a threat of repetition," *i.e.*, ***open-ended*** continuity.

The Defendants' Motion acknowledges the Supreme Court authority that sets forth the proper continuity analysis, and that "[c]ontinuity is both a closed- and open-ended concept." 492 U.S. at 239. The Defendants' analysis in the Motion, however, fails to apply the binary distinction to the analysis of the cases it cites, or to the facts here. The Defendants conflate the two approaches, therefore arriving at a flawed conclusion that fails to appreciate the distinction made in the case law between a scheme of long duration and multiple predicate acts, versus a scheme of very short duration and few predicates.

When the binary analysis under the Supreme Court's precedent in *H.J.Inc.* is applied properly to the facts here, a "pattern" is, in fact, demonstrated.

**b. A Pattern Exists Under a Closed-End Continuity Analysis**

"Closed-ended" continuity refers to a "closed period of repeated conduct, <u>or</u> to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241 (emphasis added). Predicate acts extending over a few weeks or months and threatening no future

criminal conduct do not satisfy the closed-ended continuity requirement. *Id*. at 242. That is because activity that lasts only a few months is not sufficiently continuous. *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995). On the other hand, the Ninth Circuit has rejected the notion that activity that lasts less than a year would not satisfy the closed-end durational requirements. *Id*. at 1528 (holding that there is no strict one-year rule and finding closed-ended continuity in scheme lasting approximately 13 months). Continuity may be demonstrated here, in light of the fact that the Defendants' scheme meets the requirements for a closed-end scheme of significant duration—here, over eight years and still continuing.

The Defendants cite to the decision of the D.C. Circuit in *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260 (D.C. Cir. 1995) for the proposition that Plaintiff cannot allege continuity because the Second Amended Complaint only alleges a "single scheme, single injury, and few victims." Motion at 11. The citation by Defendants refers to the D.C. Circuit's analysis in connection with a closed-end continuity analysis. But *Edmondson & Gallagher* is not persuasive here on the closed-end continuity analysis.

*First*, the D.C. Circuit utilizes a much different standard for the continuity requirement than is applied in the Ninth Circuit. *See id.* at 1265 (using the Third Circuit's six-factor test). Necessarily, other circuit's precedents contrary to Ninth Circuit law are not relevant. Rather than utilize a multi-factor test for continuity, the Ninth Circuit looks instead to whether the predicate acts are "sporadic or isolated." *Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990). Indeed, as noted by one treatise, the Ninth Circuit "has held the continuity requirement satisfied in every case in which there were multiple victims." 1-4 *Civil RICO* ¶ 4.04[3] & n.36 (Matthew Bender & Co., Inc. 2011) (collecting cases).

*Second*, this is not a "single victim" case. Here, the Complaint alleges that the Defendants' scheme has afflicted many victims—causing many and multiple injuries. The Complaint, as amended, alleges, *inter alia*, that in addition to the wrongs against Plaintiff, the following persons were also harmed:

- **The Department of Housing and Urban Development** was damaged by virtue of the false statements in loan applications made by the Defendants which were made

pursuant to the Defendants' predicate acts to assume the claims of contractors and assert false claims against the bonding company. Necessarily, a false loan application harms HUD by increasing the risk to HUD as the insurer of the loan. Moreover, the undisclosed debt on the property materially decreased the value of the collateral that is insured by HUD. (Second Amended Complaint ¶¶ 151-161.)

- **Wells Fargo, N.A**. was also damaged by virtue of the false statements in loan applications made by the Defendants, which were made pursuant to the Defendants' predicate acts to assume the claims of contractors and assert false claims against the bonding company. Necessarily, a false loan application increases the risk to the lender on a loan. Moreover, the undisclosed debt on the property materially decreased the value of the collateral secured by the lender's lien. Furthermore, the false claims in connection with the Project that have been asserted by State Insulation and potential for litigation in connection with the same, not only breached the loan agreements, but also has caused litigation to be initiated against Legacy Pointe by the bonding company, which causes Legacy Point to incur the litigation expense, compromises its financial situation, and may affect its ability as the borrower to repay the loan. (*Id.* ¶¶ 158-159.)
- **Munson Hardisty** was damaged by the Defendants' actions, in that the entity was wrongfully burdened with claims and liability and multiple litigation claims against it by numerous plaintiffs—including by the bonding company, who initiated litigation as a result of the actions of Defendants. Moreover, in order to effect the RICO scheme, the Moore Defendants also improperly wrested control of Munson Hardisty, thereby siphoning funds out of Munson Hardisty to the Defendants' own improper gain. (*Id.* ¶¶93-108.)
- **John Munson**, the other partner in Munson Hardisty was damaged by the Defendants' RICO acts, in that he was forced out of management and control because he was not willing to participate in the Defendants' improper scheme. He also lost substantial value by virtue of the Defendants' looting of Munson-Hardisty.

- **Various employees and contractors of Munson Hardisty** were harmed by the Defendants' RICO acts. Specifically, the Complaint alleges that certain employees and independent contractors of Munson Hardisty were terminated because they refused to cooperate in the Defendants improper scheme. (*See id.* ¶ 105.)
- As alleged in the Second Amended Complaint, (*see id.* ¶ 69), other persons provided an indemnity to the bonding company in connection with the Project. Each of these persons have been harmed by the Defendants' RICO acts in connection with their assertion of false claims against the bonding company. Specifically **Hardisty, Inc.; Hardisty Construction Administration and Consulting Co., Inc., John T. Hardisty Construction Co., Inc.; Hardisty Construction Management, Inc.; Munson Hardisty, LLC, John R. Munson, and Teresa Hardisty** each indemnified the bonding company and have therefore been drawn into the fray as defendants, and have suffered damages therefore, in connection with the claims asserted against the bond by Defendant State Insulation.
- **Great American Insurance Company** was damaged, and continues to be damaged by the false claims asserted by the Moore Defendants against the bonds in connection with the Project. The false claims have caused Great American to initiate litigation, and the associated expense of the same.
- Each of the **subcontractors** whose claims were purchased by Defendant State Insulation are being harmed. The claims that were purchased by Defendant State Insulation are being fraudulently asserted by State Insulation against the bonding company in direct contradiction to the representations made to HUD that no undisclosed claims against the Project existed at the time of the completion of the Project, thereby potentially implicating the underlying subcontractors who originally held the claims in the assertion of false claims. (*See id.* ¶ 163.) These claimants are numerous.
- The Second Amended Complaint also alleges that the **IRS and other taxing authorities** have been victims of the Defendants scheme, which upon information

and belief, was also designed to improperly evade taxation. (*See id.* ¶¶ 288-290.) In sum, this is not a "single victim" case. Far from it. Moreover, there is no requirement that the other victims in a RICO scheme be joined as plaintiffs. *See Lerner v. Fleet Bank*, 318 F.3d 113, 119, 125 & n.11 (2d Cir. 2003).

*Third*, *Edmondson & Gallagher* is factually inapposite to the facts and circumstances here and may thereby be distinguished. There, the plaintiffs had alleged only a scheme to prevent a ***single purchase and sale transaction***. The only injury was the loss of ***one sale***. The victims numbered only ***three***—but really only two, because one of the victims was an agent and thus had a substantive identity with the principal victim. To the contrary, this case involves separate predicate acts committed during the duration of a criminal scheme lasting over eight years (and which is still being effected). This was ***not*** a single sale transaction. Rather, the Second Amended Complaint alleges a scheme divided into multiple phases – organizational, operational, extortionate membership interest sales (in separate installments with separate related predicate acts), and the post-sale assertion of false claims. *Cf. Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951 (7th Cir. 1996).

In *Gagan*, like here, the defendants' scheme to bilk limited partners who sold their partnership interests to defendants exhibited closed-ended continuity where it involved a number and variety of predicate acts over a period of four years, which was intended to continue until all the monies received from the sale of an asset "had been diverted" to the defendants. Likewise here, the Complaint alleges that the Defendants' scheme—which in fact constituted multiple schemes—involved numerous varied predicate acts against ***different victims***, including:

- Extortion (against Plaintiff) (*See* Second Amended Complaint ¶¶ 276-277);
- Financial Institution Fraud (against Wells Fargo and HUD in connection with falsification of loan documents) (*See id.* ¶¶ 278-287);
- Mail and Wire Fraud (against the bonding company in connection with the Defendants' assertion of false claims) (*See id.* ¶¶ 288-290);
- Money laundering (against Wells Fargo, HUD, and, upon information and belief, the IRS and the taxing authorities company in connection with the Defendants assertion of false claims) (*See id.* ¶ 285);

- False statements made to a financial institution to secure a loan (against Wells Fargo and HUD in connection with falsification of loan application); (*See id.* ¶¶282-285); and
- Mail and wire fraud (committed generally against, *inter alia*, Plaintiff, Wells Fargo, HUD, the bonding company, the indemnitors on the Project bond, Munson Hardisty, John Munson, and employees of Munson Hardisty).

Moreover, these predicate acts occurred over a period of eight years. And, the scheme—which is still ongoing—will necessarily continue until the Defendants have obtained wrongful reimbursement on all of the false claims they are currently asserting against Plaintiff, Munson Hardisty, and the bonding company.[1]

Such conduct is not the kind encountered in connection with a "garden-variety" tort. Rather, it is criminal in nature and is ***exactly*** the type of conduct that RICO is intended to address and punish. Such acts have the continuity required of a closed-end scheme under *H.J., Inc.*. Therefore, a RICO pattern is established by acts of such a nature.

### c. Alternatively, a Pattern Exists Under an Open-End Continuity Analysis

Assuming *arguendo* that Plaintiff could not establish closed-ended continuity, Plaintiff may otherwise establish open-ended continuity. *See H.J. Inc.*, 492 U.S. at 242. An open-ended scheme is generally one of short duration. Open-ended continuity is the threat that criminal conduct will continue into the future. It is established by showing either that the predicate acts "include a specific threat of repetition extending indefinitely into the future" or that the predicate acts were "part of an ongoing entity's regular way of doing business." *Id.*

Under Ninth Circuit RICO jurisprudence, "[t]he standard for showing open-ended continuity is extremely low." *Sebastian Int'l, Inc. v. Russolillo*, 186 F. Supp. 2d 1055, 1067 (C.D. Cal. 2000). For example, in *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995), an appeal of a dismissal under

[1] Moreover, even assuming *arguendo* that the Defendants' scheme here had been completed, it would not matter for the **closed-ended** continuity analysis, provided that the RICO activity had continued for a sufficient length of time. In *Sun Savings*, the Ninth Circuit noted that the fact that the criminal scheme may have been completed by the last predicate act does not preclude a finding of continuity. "As long as the threat of continuing activity exists at some point during the racketeering activity, the continuity requirement is satisfied." 825 F.2d at 194 n.5.

Rule 12(b)(6), the Ninth Circuit found that continuity was demonstrated where the "defendants' willingness to participate in the kickback scheme and their affirmative misrepresentations . . . demonstrate that if they had not been fortuitously interrupted by termination, the predicate acts could have recurred indefinitely." *Allwaste*, 65 F.3d at 1530.

In *Allwaste*, the corporate officers of a recycling company solicited kickbacks, received and distributed illicit gratuities and commissions, secretly invested the proceeds in businesses that competed with the recycling company, and created false receipts overcharging the recycling company for transportation of goods and services. The Ninth Circuit found that a pattern existed because the defendants had demonstrated that extortion had become the defendants' "regular way of doing business." In arriving at this conclusion, the Ninth Circuit relied on the plaintiff's allegations that the defendants had been involved in demanding four different kickbacks, had obtained the proceeds and then falsified documents in connection with the kickbacks. Furthermore, because these activities were made possible by the defendants' continued employment status, were directed at a variety of suppliers, and were not connected to the consummation of any particular transaction, the Ninth Circuit drew an inference that the defendants' activities threatened to continue in the future and had become defendants' way of doing business.[2]

Similarly, in *Sun Savings and Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987), a bank sued its former president under RICO for receiving kickbacks from the bank's customers and depositing them into a fictitious account. In *Sun Savings*, the Ninth Circuit held that four predicate acts that spanned a two-month period satisfied the open-ended continuity requirement. The Ninth Circuit determined that the alleged predicate acts "did pose a threat of continuing activity because they covered up a whole series of alleged kickbacks and receipts of favors, occurred over several months, and in no way completed the criminal scheme." *Id.* (footnote omitted).

In *Sun Savings*, moreover, the Ninth Circuit explained the meaning of a "threat of continuing activity" (in the context of what the Supreme Court would later deem to be an open-ended continuity

[2] The fact that an activity is a defendant's regular way of doing business may be proved by the frequency of repeated similar bad acts. *See Ticor Title Ins. Co. v. Florida*, 937 F.2d 447 (9th Cir. 1991) (stating that three episodes of forgery over 13 months with similar purposes and identical methods suggested that the practice had become a regular way of conducting business).

analysis).[3] *Id.* at 193. Specifically, where predicate acts "occur[ ] separately over time, and they are not isolated or sporadic events," they establish the required continuity. *Id.* at 194. The Ninth Circuit further explained the concept by reference to a fact pattern where continuity would be lacking. Continuity is not shown, for example, where the predicate acts "furthered the diversion of a single shipment of goods and appear to have occurred at nearly the same time, and because once those acts were complete, defendant had no further need to commit predicate acts." *Id.* (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co. Inc.*, 806 F.2d 1393, 1393 (9th Cir. 1986)). On the other hand, where the alleged predicate acts "covered up a whole series of alleged kickbacks and receipts of favors, occurred over several months, and in no way completed the criminal scheme," they do pose a threat of continuing activity. *Id.*

Here, the acts alleged in the Second Amended Complaint are not analogous to a "single shipment of goods." They are much more like the case where insiders had received a series of kickbacks and then engaged in a cover-up. Here, the Defendants not only defrauded the Plaintiff of his membership interest—but, in addition, deceived the HUD lender and, after that, then engaged in a separate campaign to assert false claims against the company that had issued the bond on the Project. Each of these acts was in ***addition to*** the Defendants' scheme to divest Plaintiff of his membership interest. Although each of these acts was certainly ***related*** to the divestment of Plaintiff's membership interest, that is not the same thing as each of these separate predicates constituting "one transaction."

Also, here, the Second Amended Complaint demonstrates that the Defendants will, in fact, commit other fraudulent acts. Here, the fraud is active and *ongoing*, which will necessarily require the Defendants to commit other (new) predicate acts in the effectuation of their ongoing scheme.[4] The Plaintiff's Complaint alleges that Defendants' fraud results in continuing harm to Plaintiff and other entities. The Plaintiff's Second Amended Complaint alleges that the Defendants are

---

[3] *Sun Savings* was decided prior to *H.J. Inc.*, but the Ninth Circuit has stated that it is still good law because it is consistent with H.J. Inc. *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 n. 2_(9th Cir. 1995) (stating that *Sun Savings* is consistent with *H.J. Inc.* because it "held that continuity does not require multiple criminal schemes, and we stated that RICO should be read broadly").

[4] The Defendants will necessarily use the mails and wires in connection with their litigation to collect on the false claims they are asserting and in the litigation that is connected to their assertion of false claims.

committing RICO predicate acts by asserting the false claims purchased by State Insulation against the bonding company. Furthermore, the assertion of the false claims against the bonding company by Defendants constitute *separate transactions* (and are separate and apart from the transactions constituting RICO predicate acts relating to the sale of Plaintiff's membership interest). The Defendants' ongoing fraud involves ***more than one transaction***.

As noted earlier, the Defendants point to the D.C. Circuit in *Edmondson & Gallagher*, but fail to address whether they are analyzing an open-end or closed-end continuity.[5] But it really does not matter, because *Edmondson & Gallagher* is distinguishable here in connection with the open-ended continuity analysis where it is factually inapposite. In connection with an open-end continuity analysis, the D.C. Circuit found it dispositive that the plaintiffs could point to "***nothing*** suggesting any reason to expect that these defendants . . . will again engage in RICO-violating conduct." *Id.* at 1264 (emphasis added). Here, to the contrary, the Defendants are currently engaging in RICO-violating conduct, which necessarily means that predicate acts will continue to occur. Moreover, it is clear that they will continue to do so in connection with effectuating their goal to assert false claims against the bonding company.

In addition, as noted below, the Plaintiff has alleged the existence of prior fraudulent schemes by the Moore Defendants in connection with business transactions. Indeed, as discussed below, the facts of the fraud practiced by the Moore Defendants in connection with the Western Insulation affair exhibits the same pattern of conduct as is alleged in the Second Amended Complaint. Here, unlike in *Edmondson & Gallagher*, the Complaint alleges sufficient facts to demonstrate predicate acts which were initiated to in connection with a series of alleged false claims (and the associated cover-up regarding their fraudulent nature), false statements made to HUD and the lender on the Project, which occurred over several years, and which in no way completed the criminal scheme. *Cf. Sun Savings*, 825 F.2d at 194 (citing *Schreiber*, 806 F.2d at 1393).

The Defendants also point to the Ninth Circuit's decision in *Medallion Television Enters.*,

[5] As noted above, it is very important to distinguish between the RICO cases' analysis of open versus closed ended continuity. For example, the "single scheme, single injury, single victim" language of *Edmondson & Gallagher* applied to its closed-end continuity analysis. *See Edmondson & Gallagher*, 48 F.3d at 1264-65.

*Inc. v. SelecTV*, 833 F.2d 1360 (1987), for the proposition that because Defendant Moore obtained Plaintiff's membership interest, the alleged object of the scheme has been obtained. Motion at 8. *Medallion* is also inapposite and thus should have little bearing on the determination of the Defendants' Motion. *First*, *Medallion* was decided prior to the Supreme Court's primary decisions on the continuity requirement and does not distinguish between an open-end and closed-end scheme. Moreover, *Medallion* involved a single transaction to acquire certain broadcast rights. When it was revealed that one of the joint venture partners did not have the promised two million dollars worth of broadcast licensing agreements with television stations, the defrauded partner asserted a RICO claim. There was only one victim (the defrauded joint venture partner). No one else was affected. Likewise, in *Medallion*, the court concluded that a threat of continued criminal activity was not at issue where "the fraud was complete." *Id.* at 1364. Most important—and strikingly similar to the D.C. Circuit's comments in *Edmundson* concerning an open-end continuity analysis, the Ninth Circuit noted that

> [Plaintiff] has not directed us to any evidence that [defendant] defrauded it in any other way as part of this scheme or any other, not is there anything in the nature of the transaction to suggest that [defendant] would have needed to commit any other fraudulent acts.

*Id.*

As discussed above, the Second Amended Complaint does not allege a single transaction. Nor does it concern a single victim. The fraud is not complete—it is still ongoing. Moreover, unlike in *Medallion*, here, the Defendants necessarily will commit other predicate acts in connection with their continuing campaign to assert false claims against the Project bond.

In summary, the Plaintiff has also alleged the requirements to prove open-end continuity.

**2. Defendants Misconstrue the Relevance of the Western Insulation Affair—Which Pertains to the Question of Continuity and the Inference of Future RICO Violating Conduct**

The Defendants otherwise contend that because Plaintiff has not alleged the separate scheme committed by the Defendants in connection with the Western Insulation affair as a "predicate act," that the facts of this affair are to be disregarded by this Court in connection with the RICO analysis. The Defendants miss the point completely. The Plaintiff's intent was not to plead the Western

Insulation affair as a predicate act—the Second Amended Complaint alleges that Defendants have committed sufficient predicate acts already. Rather, the relevance of the Western Insulation affair is to the question of whether the predicate acts that ***have*** been pled are likely to recur and thus demonstrate continuity.

Specifically, as alleged in the Plaintiff's Second Amended Complaint at ¶¶ 265-268, the Moore Defendants engaged in a very similar scheme to defraud the purchaser in connection with the sale of one of the Moore Defendants' business in 2001. As alleged in the Second Amended Complaint, after having received approximately $41 million in sale consideration and after having agreed not to compete with that business as part of the consideration for the sale, the Moore Defendants almost immediately breached that agreement and set up a competing business. The manner in which they did so is relevant here. They did so utilizing many of the same deceptive tactics as are alleged to have been used against Plaintiff. For example, they set up shill entities (including Defendant State Insulation) to try to hide their actions. They then installed a "friend" as their purported manager of the competing entity. Next, they entered into an agreement with that manager whereby the Moore Defendants could control all expenditures and actions of the competing entity. Then—using a substantially similar control tactic as they had used against Plaintiff here, they obtained a deed of trust on the personal residence of manager of the competing entity, which secured a line of credit issued by the Moore Defendants to the competing entity. The Moore Defendants were, as noted above, in complete control of the competing entity and its expenditures. They also had the ability to foreclose on the manager's home if the line of credit issued to the competing entity was defaulted upon. In this way, the Moore Defendants obtained absolute control over the manager—and thereby obtained the power to exact the manager's compliance with each of their demands made in connection with their illegal scheme.[6] These facts (and other similar facts) are contained in the published decision of the Eastern District of Virginia in *Western Insulation, L.P. v.*

---

[6] Plaintiff would here like to make a brief response to the Defendants' Footnote No. 2 in their Motion, where the Defendants suggest that Plaintiff should not complain about the secured loan provided to him by the Defendants. The point the Defendants seem to miss is that the ***terms*** for this secured loan were intended—as it was with the victim in the Western Insulation affair—to make Plaintiff entirely beholden to them and make him unable to extricate himself from their scheme. In both respects, that was improper.

*Moore*, 2006 U.S. Dist. LEXIS 77065 (E.D. Va. Aug. 28, 2006) and 2008 U.S. Dist LEXIS 4390 (E.D. Va. Jan. 22, 2008). Plaintiff respectfully requests that the Court would take judicial notice of the foregoing decisions.

The Defendants contend that the Western Insulation affair is not sufficiently "related" and thus query: what is the relevance? To be sure, the improper acts of the Moore Defendants that are recited in the aforementioned District Court opinions in connection with the Western Insulation affair are quite relevant to the question of continuity. In *Edmondson*, for example, the primary reason for denying the existence of continuity was that, in the words of the Third Circuit, "the plaintiffs point to ***nothing*** suggesting any reason to expect that these defendants, together or separately, ***will again engage in RICO-violating conduct***." 48 F.3d at 1264 (emphasis added). The fact that here the Moore Defendants appear in a published district court decision demonstrating a *modus operandi* of a strikingly similar nature to the scheme in which Plaintiff was ensnared by the Moore Defendants is evidence that these Defendants are recidivist in their conduct. In light of this, there is a strong suggestion that the Moore Defendants will use this same type of scheme—again and again—in the future against unsuspecting victims.

As held by the Supreme Court, open-end continuity is the threat that criminal conduct will continue into the future. One way of establishing that is by showing that the predicate acts were "part of [a] regular way of doing business. *H.J. Inc.*, 492 U.S. at 242. In other words, "the leopard does not change its spots." The Plaintiff's Second Amended Complaint so alleges and therefore alleges open-end continuity.

**C. Plaintiff Has Properly Alleged a Claim of Abuse of Process**

Plaintiff's allegations supporting its cause of action for abuse of process state facts well beyond the "mere fling of a complaint" as posited by the Defendants. Generally, an abuse of process claim lies where process is used to obtain "an unjustifiable collateral advantage." *Younger v. Solomon*, 38 Cal. App. 3d 289, 297 (1974). That is, there is usually an improper purpose in "the form of coercion to obtain a collateral advantage" and some "act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Templeton Feed & Grain v. Ralston Purina, Co.*, 69 Cal. 2d 461, 466 (1968). It is this "form of ***extortion***" rather than the

filing of a complaint or issuance of other formal process that constitutes the tort. *Id.* (emphasis added). To illustrate, the Supreme Court of California found that plaintiffs sufficiently stated a claim for abuse of process when they alleged that defendant knowingly instituted suits in an improper county pursuant to inadequate pleadings for the ulterior purpose of making the action more difficult to defend and thereby coercing default or inequitable settlements. *Barquis v. Merchants Collection Assoc. of Oakland, Inc.*, 7 Cal. 3d 94, 104-105 (1972).

Here, Plaintiff alleges just that, *i.e.*, that Defendants filed the State Insulation Complaint knowing it to be frivolous for the *ulterior purpose of triggering Plaintiff's indemnity obligation* to Great American and thereby causing default on the Moore Complaint for Declaratory Relief and *coercing the surrender of assets* by Plaintiff that Defendants were by no means entitled to. [*See* Second Amended Complaint, ¶ 343.] Stated differently, the act complained of by Plaintiff is not the "mere" filing of the State Insulation Complaint but rather, the use of the threat of the identified litigation to extort valuable assets from Plaintiff. [*Id.* at ¶¶, 160, 343.] Like the defendant in *Barquis*, Defendants instituted suits with an ulterior motive and wrongfully used the process to coerce an unjustifiable collateral advantage.

By the same token, the Defendants' reliance on the privilege provided by section 47 of the California Civil Code is misplaced. Plaintiff's cause of action does not rest on allegations that Plaintiff was injured by the content communicated in the State Insulation Complaint. Rather, Plaintiff alleges an ulterior motive and wrongful and coercive conduct by Defendants in leveraging the use of process in filing the complaint to extort assets from Plaintiff. *See Drum v. Bleau, Fox & Assocs.*, 107 Cal. App. 4th 1009, 1027 (2003) (explaining that the litigation privilege is limited to "publications and broadcasts" and does not apply to conduct). Further, by the very nature of Plaintiff's allegations, the Defendants' conduct was not made to "achieve the objects" of the State Insulation Complaint litigation as required for the privilege to apply, but rather, as relevant to Plaintiff's abuse of process claim, was to achieve a wrongful and inequitable ***collateral advantage*** in extorting Plaintiff of assets unrelated to payment by Great American on the bond. *See Younger*, 38 Cal. App. 3d at 30-302 (explaining elements of litigation privilege).

As such, the Plaintiff's tenth cause of action for abuse of process should not be dismissed.

**D. Plaintiff's First Cause of Action Relates Back**

Plaintiff's first cause of action for breach of a specific promise to answer for the debt of another asserts a claim under the well-known doctrine that "when an oral promise is made for a consideration beneficial to the promisor, so that it appears that he gave the promise merely for his own pecuniary or business advantage . . it is deemed an original obligation of the promisor and need not be in writing. *See Michael Distributing Co. v. Tobin*, 225 Cal. App. 2d 655, 664 (1964). The *prima facie* case for such a claim may generally be made where, as here, a majority owner of an entity promises to make payment of a debt of the entity, for services that improve the value of the entity—and thus benefit the owner.

Here, this claim is timely because it relates back to Plaintiff's *original* complaint, filed July 19, 2011. "[A]n amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or a new cause of action." *Pointe San Diego Residential Community v. Procopio, Cory, Hargreaves & Savitch, LLP*, 195 Cal. App. 4th 265, 277 (2011) (citing references omitted). In light of the purpose of the statute of limitations to afford defendants the opportunity to prepare their defense, "[i]n determining whether the amended complaint alleges facts that are sufficiently similar to those alleged in the original complaint, the critical inquiry is whether the defendant had adequate notice of the claim based on the original pleading." *Id*.

Here, Plaintiff's Second Amended Complaint is based on the same facts as his original complaint—generally, facts relating to the Project, the relationship between the parties, and conduct of the Moore Defendants. In particular, as to Plaintiff's claim for breach of specific promise, the *original complaint* alleged that Defendant Hal Moore expressly demanded and expressly promised to personally pay for out of scope labor and materials provided to Legacy Pointe and failed to do so. [*See* Complaint, ¶¶ 94-99.] The original complaint is more than sufficient to put the Defendants on notice of the allegations they are facing. Moreover, Plaintiff's Second Amended Complaint seeks the same recovery as its original complaint and refers to the same instrumentality, namely wrongdoing by Defendants.

### E. Plaintiff has Adequately Pled a Confidential Relationship

Contrary to the Defendants' contentions, a claim for constructive fraud pursuant to Cal. Civ. Code § 1573 does **not** necessitate a fiduciary relationship. Rather, "[c]onstructive fraud also applies to nonfiduciary 'confidential relationships.'" *See Tyler v. Children's Home Society*, 29 Cal. App. 4th 511, 549 (1994). A confidential relationship "may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship." *Sanders v. Sutton*, 40 Cal. 3d 607, 615 (1985) (citations omitted). Unlike a fiduciary relationship, a confidential relationship may arise between two people "even though they have ***no formal relationship*** such as affinity or consanguinity, or attorney and client, principal and agent, trustee and beneficiary." *Kloehn v. Prendville*, 154 Cal. App. 2d 156, 160 (1957) (citations omitted) (emphasis added). In short, a "confidential relation may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." *Estate of Arbuckle*, 98 Cal. App. 2d 562, 569 (1950).

The Defendants appear to confuse the cases dealing with fiduciary relationships as a matter of law, with those arising out of a confidential relationship. Indeed, compliance with fiduciary duties is exacted as ***a matter of law*** from parties to various technical relationships, such as partnerships and joint ventures. But entirely apart from such instances, a fiduciary status may exist ***as a matter of fact*** where it would not otherwise be inferred from the mere relationship of the parties. *Bank of America v. Sanchez,* 3 Cal.App.2d 238, 243 (1934). Furthermore, apart from fiduciary status arising under law, one who voluntarily assumes a position of trust and confidence ***is a fiduciary***, as a matter of fact, and he remains a fiduciary as long as trust and confidence are reposed in him.. Cal. Civ. Code, § 2219; *see also, Robbins v. Law*, 48 Cal.App. 555, 561 (1920) *Sime v. Malouf*, 95 Cal. App. 2d 82, 98 (1949).

An additional factor in the factual determination of fiduciary status arising out of a confidential relationship is whether the defendant has assumed control of the property of the plaintiff. The California Supreme Court has held that the prerequisite of a confidential relationship is the reposing of trust and confidence by one person in another who is cognizant of this fact. The key factor in the existence of a fiduciary relationship lies in control by a person over the property of

another. *See Vai v. Bank of America Nat'l Trust & Sav. Ass'n*, 56 Cal. 2d 329, 338 (1961). Likewise, co-venturers—who thereby obtain control over each others' joint venture property—have fiduciary duties imposed upon them by virtue of the joint venture relationship. *See Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 290 (1966).

In the present case, Plaintiff has adequately alleged the existence of confidential relationship with Defendant Hal Moore to support Plaintiff's claim for constructive fraud, and that on several grounds. *First*, Plaintiff has stated facts relating to his trust and confidence in Defendant Hal Moore based in large part on their longstanding friendship and business history. *Second*, Plaintiff also averred to Defendant Hal Moore's unique position of power over Plaintiff by virtue of his access to Plaintiff's confidential personal financial information and position at MH. [*See* Second Amended Complaint, ¶¶ 12-17; 248-55.] As in *Tyler v. Children's Home Society of California*, 29 Cal. App. 4th 511, 549 (1994), Defendant Hal Moore "gained the confidence" of Plaintiff and "purported to act to advise with [Plaintiff's] interest in mind." Such a position of power and control was further increased by Plaintiff's financial and legal difficulties and related vulnerability to Defendant Hal Moore's control and related lack of arms' length relationship with Plaintiff.

*Third*, as alleged in the Complaint, Defendant Hal Moore assumed complete control of Munson Hardisty, and thereby obtained control of Plaintiff's property. Moreover, in so doing, Defendant Hal Moore also stepped into a classic "fiduciary" role—by assuming an agency status. Indeed, in such an agency relationship, "the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Gibson v. Gov't Employees Ins. Co.*, 162 Cal. App. 3d 441, 445 (1984). In that Defendant Hal Moore asserted control over the management of Munson Hardisty, he was thereby entrusted with the duty to act in the highest of good faith towards Plaintiff—who placed the highest of trust and confidence in him in connection with the oversight of Munson Hardisty and its assets and reputation. *See Aagard v. Palomar Builders, Inc.*, 344 F.Supp.2d 1211, 1220 (E.D. Cal. 2004) (citing *Kudokas v. Balkus*, 26 Cal. App. 3d 744, 750 (1972)).

Fourth, the Second Amended Complaint alleges facts that demonstrate the presence of a joint

venture between Plaintiff and Defendant Hal Moore. *See* Second Amended Complaint at ¶¶ 45-82. As the Second Amended Complaint alleges, a substantial amount of the acts complained of occurred during the time period prior to the time that Defendant Hal Moore became a member of the Legacy Pointe LLC. As such, the laws governing limited liability company members did not apply during this time period. Instead, the fiduciary duties arising out of the confidential relationship of joint venture partners applied. *See Boyd v. Bevilacqua*, 247 Cal. App. 2d at 290.

In sum, and contrary to the Defendants' assertions, the relationship between Plaintiff and Defendant Hal Moore need not satisfy the technical requirements for recognition of a fiduciary relationship by law. Here, moreover, Plaintiff has adequately alleged facts of a confidential relationship—which is a matter of fact. *Tyler*, 29 Cal.App.4th at 549 (stating that "[t]he existence of a confidential relationship is generally a question of fact . . ."). Plaintiff's factual allegations in this respect must be accepted as true for purposes of the Defendants' Motion.

**F. Plaintiff's Cause of Action for Securities Fraud Is Not Barred by the Statute of Limitations**

Plaintiff's cause of action for securities fraud is not barred by the statute of limitations merely because the facts supporting the claim occurred outside of the limitations period. The statute of limitations provided under Cal. Corp. Code § 25506 is subject to the inquiry notice rule. *Deveny v. Entropin, Inc.*, 139 Cal. App. 4th 408, 423 (2006). As such, the statute of limitations is not triggered until a plaintiff is aware or should be aware that he has been defrauded. *See id.* at 428.

Contrary to the Defendants' contentions, on its face, the Second Amended Complaint does ***not*** state that Plaintiff became aware of the Defendants' fraudulent conduct relating to the sale of Plaintiff's membership interest more than two years before the filing of Plaintiff's original complaint. To the contrary, the Second Amended Complaint alleges that Plaintiff did not realize the fraud until at least late August 2009 when he was informed by Defendant Hal Moore that only after the closing of the take out financing on the Project did Plaintiff realize that Defendant Moore would renege on all of his promises and that he had been defrauded:

> Immediately after the closing occurred, Defendant Hal Moore sought out Plaintiff and ***only then finally revealed*** that his representations to pay Plaintiff $380,000 for the transfer of his 27 percent membership interest in the Company were false and part of

> a fraudulent design to obtain Plaintiff's ownership in the Company for nothing. Defendant Hal Moore finally told Plaintiff at that time that he had no intention of paying Plaintiff the $380,000 in promised consideration for the transfer of Plaintiff's 27 percent membership interest to Defendant Hal Moore. Most shocking to Plaintiff, Defendant Hal Moore informed him that he would be enforcing liquidated damages against M-H and, further that State Insulation would be making a claim against the bonds for the unpaid amounts of approximately $2.2 million. Defendant Hal Moore coldly informed Plaintiff at that time that he "wasn't getting a dime."

Second Amended Complaint at ¶ 158 (emphasis added). Moreover, the question of when Plaintiff reasonably should have known of the Defendants' fraud in connection with the membership is generally a question of ***fact*** for the jury. As such, Plaintiff's well pleaded allegations in this respect must be accepted as true.

## III. CONCLUSION

In light of the foregoing, Plaintiff requests that the Motion to Dismiss of Defendants be denied in its entirety and for such other relief that the Court deems just under the circumstances.

Dated: March 10, 2012

BAKER & McKENZIE LLP

By: /s/ Ali M.M. Mojdehi
Ali M.M. Mojdehi
Janet D. Gertz
Attorneys for Plaintiff
John T. Hardisty