William B. Federman, Esq.
(*admitted pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73008
Phone: 405.235.1560
Fax: 405.239.2112
wbf@federmanlaw.com
jdw@federmanlaw.com

Attorneys for Plaintiff John T. Hardisty
*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOHN T. HARDISTY,

Plaintiff,

v.

HAROLD MAXINE MOORE; ELAINE K. MOORE (aka MELANIE K. MOORE); STATE INSULATION, LLC, an Arizona limited liability company; STATE INSULATION, LLC, a Nevada limited liability company; THE 1998 HAROLD M. MOORE REVOCABLE TRUST; and MARK PELUSO, an individual,

Defendants.

---

Harold Maxine Moore,

Counterclaimant,

v.

John T. Hardisty,

Counterdefendant.

Case No. 3:11-cv-01591-AJB-BLM

**PLAINTIFF JOHN T. HARDISTY'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

I. FACTUAL BACKGROUND .......... 1

II. ARGUMENT AND AUTHORITIES .......... 11

A. Standard of Review .......... 11

B. Plaintiff and Defendant Hal Moore had a Confidential Relationship .......... 12

C. Fraud .......... 14

D. Constructive Fraud .......... 18

E. Quiet Title .......... 19

F. Securities Fraud .......... 19

G. Conversion .......... 20

H. Conspiracy and Aiding and Abetting .......... 21

I. Abuse of Process .......... 21

III. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .......... 11

*Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025 (9th Cir. 1992) .......... 16

*Bank of America v. Sanchez*, 3 Cal.App.2d 238 (1934) .......... 13

*Brown v. Wells Fargo Bank, NA*, 168 Cal.App.4th 938 (2008) .......... 14

*Domingeuz-Curry v. Nevada Transportation Department*, 424 F.3d 1027 (9th Cir. 2005) .......... 11

*Elkind v. Woodward*, 152 Cal.App.2d 170 (1957) .......... 17

*Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001) .......... 11

*Gibson v. Gov't Employees Ins. Co.*, 162 Cal. App. 3d 441 (1984) .......... 12

*Gonzalez v. Millard Mall Services, Inc.*, 2012 WL 727867 (S.D. Cal.) .......... 11

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 63 P.3d 937 (Cal. 2003) .......... 24

*Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982) .......... 23

*MTC Electronic Technologies Co., Ltd. v. Leung*, 876 F.Supp. 1143 (C.D. Cal. 1995) .......... 19

*Odorizzi v. Bloomfield School District*, 246 Cal.App.2d 123 (1966) .......... 17

*Robbins v. Law*, 48 Cal.App. 555 (1920) .......... 12, 13

*Spellens v. Spellens*, 49 Cal.2d 201, 232, 317 P.2d 613 (Cal. 1957) .......... 21

*Tyler*, 29 Cal. App. 4th at 549 .......... 12

*Vai v. Bank of America National Trust and Savings Assn.*, 56 Cal.2d 329 (1961) .......... 13

*Wasatch Bank of Pleasant Grove v. Surety Insurance Company of California*, 703 P.2d 298 (Utah 1985) .......... 22

*Younger v. Solomon*, 38 Cal.App.3d 289 (Cal. App. 1974) .......... 21

**Statutes**

Cal. Civ. Code § 1573 .......... 17

Cal. Corp. Code § 25410 .......... 19

**Rules**

Fed.R.Civ.P. 56(c) .......... 11

Plaintiff John T. Hardisty ("Plaintiff" or "Hardisty") hereby submits his Opposition to Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment. Plaintiff Hardisty asserts that significant issues of material fact are subject to dispute. Defendants' Motion should thus be denied by this Court and Plaintiff's action be allowed to proceed to trial on the merits.

## I. FACTUAL BACKGROUND

Prior to the instant dispute**,** Hardisty and Defendant Harold Maxine ("Hal") Moore were close friends. The friendship spanned over many years and, throughout the duration of that friendship, Hal Moore induced Hardisty to impose the utmost confidence and trust in him. Hardisty and Hal Moore were not just casual business acquaintances, as Hal Moore now contends. Rather, Hardisty and Hal Moore have enjoyed and long and close friendship that began in approximately 1983. [Hardisty Declaration at ¶1]. Both Hal Moore and Hardisty make their living in the construction industry. Hal Moore is a CPA and older than Hardisty and, over the years he has known Hardisty, he has acted as a significant mentor to Hardisty, including by helping Hardisty develop a construction business of his own. [*Id*. ¶¶2-6.] Hal Moore also became Hardisty's partner during the time period at issue in this case.

Between 1983 and the commencement of the Legacy Pointe project, Hardisty had an ongoing business relationship with Hal Moore, participating in Hal Moore's business ventures on an *ad hoc* basis, as Hal Moore needed. [*Id*. ¶¶3-4.] During this time, Hal Moore mentored Hardisty by allowing Hardisty to be very closely involved in Hal Moore's businesses. [*Id*. ¶3-6.] In addition, Hardisty was formally employed by one or more of Hal Moore's businesses twice between 1986 and 1989. During the time he was an employee, he was encouraged by Hal Moore to sit in on business meetings and to observe Hal Moore's interaction with his other managers and corporate divisions. [*Id*. at ¶3]. Even during the time he was not officially employed by Hal Moore, Hardisty and his wife regularly were invited and

attended company Christmas parties hosted by Hal Moore. [*Id*. at ¶8].

Hardisty and Hal Moore were also extremely close friends outside of their business relationship. Even after Hal Moore fired Hardisty in a fit of anger, that did not affect the friendship, and they continued to have lunch and drinks after work on a regular basis, where they would discuss Mr. Hardisty's business, construction projects they might be able to work on together, as well as Hal Moore's personal life. [*Id*. at ¶4-5]. Hardisty was Hal Moore's confidante during his volatile third marriage and his subsequent divorce, which was particularly contentious as therewas no prenuptial agreement. [*Id*. at ¶7]. Hardisty was also invited to Hal Moore's house to celebrate his engagement to Melanie Moore, and attended the couple's wedding, which, because it took place on a boat in San Diego, was limited to family and very close friends. [*Id*.]

In order to allow Mr. Hardisty's construction business to perform lucrative surety (job completion) work for the bonding companies in 2001, Mr. Hardisty needed to obtain a line of credit. Hal Moore used his influence to help Hardisty establish a line at Hal Moore's own bank. [*Id*. at ¶9]. Hal Moore first reviewed and helped Plaintiff Hardisty organize all of his personal and business financial information, including tax returns and balance sheets. From that time forward, because he trusted him and welcomed his help, Hardisty gave Hal Moore complete and virtually unfettered access to his individual and corporate financial information. [*Id*. at ¶9].

As a result of the surety work, Hardisty's construction company was growing, and doing well enough that Hardisty required additional office help, so he hired a former employee of Hal Moore's in 2003. [*Id*. at ¶10]. The employee began embezzling from Hardisty's business, and stole almost $800,000 before he was discovered. [*Id*.]. By the spring of 2005, as a result of the embezzlement, Hardisty was unable to pay the company's bills, and his company was in financial trouble. [*Id*. at ¶11]. Hal Moore learned of Hardisty's financial problems, and called Hardisty to offer assistance. Hal Moore counseled Hardisty against filing bankruptcy. Instead, Hal

Moore handed Hardisty a personal check for $175,000, which he said should be used to fund the company payroll. [*Id*. at ¶11]. Hal Moore also reached out to Hardisty's material suppliers to support Hardisty and, by using his influence, to help Hardisty to continue his operations while he continued to help Hardisty solve the problems caused by Hal Moore's former employee. [*Id*.]. Hal Moore ultimately personally loaned Hardisty over $1 million in order to help Hardisty continue his business operations and fund the litigation against the embezzler. In order to give Hardisty financial guidance, that is, to ensure that the money was being wisely spent, Hal Moore met regularly with Hardisty, and Hardisty provided Hal Moore with detailed and updated financial information, both as to his businesses and as to his own personal finances. [*Id*. at ¶13]. This information exchange all occurred in the context of a close personal friendship, and absent Hardisty's trust in Hal Moore and belief that Hal Moore had his very best interests at heart, Hardisty would not have given Hal Moore such open access to his financial information. During this time I also allowed Hal Moore to operate one of his California businesses rent free in my offices. [*Id*. at ¶14].

In June 2007, Hardisty learned of an opportunity to become involved in a HUD financed housing project in Knoxville, Tennessee, called Legacy Pointe (the "Project"). The owner and developer was Legacy Pointe Apartments, LLC, a Tennessee limited liability company (the "LLC"). [*Id*. at ¶15.]. Hardisty negotiated and structured a deal with the then-owner of the equity in the LLC and developer of the Project, who had insufficient capital to complete the Project, under which Hardisty would become the majority equity partner of the LLC and would thereby take over the ownership and development of the Project. Hardisty initially obtained a 27% membership interest in the LLC and was offered the right to obtain an additional 50% interest in exchange for a contribution of $1.5 million. [*Id*. at ¶18].

In August 2007, while Hardisty was in discussions with other investors who had expressed an interest in the Project, Hal Moore informed Hardisty that he wanted to

become involved as well. [*Id*. at ¶19]. Not only did Hal Moore have cash readily available to invest in the Project and could meet the short timetable set by HUD, but Hardisty trusted Hal Moore and was thus comfortable with having him as his partner. Hardisty also thought Hal Moore's business and construction expertise and guidance would be invaluable. [*Id*. at ¶21].

Hal Moore agreed to make a short-term loan to Hardisty for the $1.5 million, to enable Hardisty to have the funds available for a prompt closing on the HUD construction financing for the Project. The loan to Hardisty was agreed by Hal Moore and Hardisty to be a temporary measure, to be discharged and deemed a capital contribution when Hal Moore received the 50% equity interest in the LLC, as soon as Hal Moore could be approved by HUD as a Project member, which approval was not possible before the required closing date of August 28, 2007. [*Id*. at ¶22]. The parties began circulating a draft Memorandum of Understanding on August 15, 2007. [*Id*. at ¶23]. Hal Moore required all correspondence, including the proposed drafts, to be sent through Melanie Moore, because Hal Moore represented that he did not use a computer and objected to email. [*Id*.].

On August 20, 2007, just days before the commitment from HUD was set to expire, Hal Moore demanded that his temporary loan to Hardisty for $1.5 million be secured by a promissory note from Mr. Hardisty, as well as deeds of trust on Hardisty's home and business properties. [*Id*. at ¶25]. In accordance with the terms that had been set forth in the Memorandum of Understanding, Hal Moore orally assured Hardisty that the note was to be very short term – only until he was approved by HUD and received his share of the LLC, or in case Mr. Hardisty got "hit by a bus,"– and that the deeds of trust would be released at that time as well. [*Id*. at ¶25]. Hardisty consented to the demand, both because he wanted the Project to go forward, and because the terms of the Memorandum of Understanding provided that the loan would be discharged in any event, as soon as Hal Moore received his membership

interest. Hardisty proceeded because he relied on and trusted Hal Moore's representations and also was anxious for the Project to close on time. [*Id*. at ¶26]. Hardisty was not advised by counsel in connection with the documents he signed. [*Id*. at ¶27.]

HUD also required for the closing that Munson-Hardisty, LLC ("Munson-Hardisty"), the LLC formed to be the general contractor for the Project, obtain a payment bond in the amount of approximately $18 million, which Munson-Hardisty applied for on September 4, 2007 from Great American Insurance Company. [*Id*. at ¶28]. Hardisty was also required to enter into an indemnity agreement as surety for the bond, as were his wife and all of his business entities. [*Id*.].

Just before closing, Great American also added a requirement that Munson-Hardisty deposit $750,000 in a certificate of deposit to ensure payment to the subcontractors on the project. Hardisty was prepared to abandon the deal, but Hal Moore encouraged him to proceed, agreeing to deposit $750,000 into a bank CD held in Munson-Hardisty's name, stating that the sole condition would be that interest on the money deposited in the CD be returned to him. [*Id*. at ¶29]. Despite Hal Moore's representations, while standing in line at the bank to purchase the CD, Plaintiff Hardisty was surprised by being presented with a promissory note by Melanie Moore, who demanded that the note be signed by Hardisty prior to her endorsing over a check for the purchase of the CD. Under the circumstances, Hardisty did not have the ability to read, much less review or comment on the note. [*Id*. at ¶30-31]. To induce him to sign the note Melanie Moore represented to Hardisty that the note would not need to be repaid until the bonding company released the $750,000, at which time the $750,000 was to be returned to Hal Moore, and Hardisty's obligation under the note would be deemed satisfied. [*Id*. at ¶30]. The note did not agree with the terms that Melanie Moore represented. The note also contained the additional term that Hal Moore was to be guaranteed a minimum return of 13%, with any deficit to be paid by

Munson-Hardisty, a term that had not been disclosed. [*Id.*]

The HUD loan for the Project closed on September 13, 2007, and Hal Moore was approved by HUD as a member of the LLC on November 7, 2007. [*Id.* at ¶32]. As set forth above, Hardisty was told and believed that the $1.5 loan was discharged because Hal Moore had received his equity interest in the LLC. [*Id.* at ¶34.] Hardisty was reasonable in this understanding, because otherwise Hal Moore would have received his membership interest in the LLC *for free*, which was not the deal as had been negotiated. [*See id.*] Having relied on the fact that the loan for $1.5 million had been discharged, Plaintiff also relied on the fact that the deeds of trust on his home and business properties had been cancelled and of no further force and effect once Hal Moore had received his membership interest. [*Id.*].

Hardisty did not learn that the deeds of trust on his home and business properties had not been cancelled and reconveyed until he was in the process of refinancing his house in January 2008. [*Id.* at ¶35]. Hardisty immediately made a demand to Hal Moore and Melanie Moore that the liens be released, and was told by the Moores that the deeds would be reconveyed as soon as possible. [*Id.* at ¶36-37]. Hardisty did not learn until much later that the deeds of trust were also securing the promissory note for the $750,000 in the CD by virtue of a “dragnet” clause in the deeds of trust. [*Id.*].

Upon receiving his membership interest in the LLC, Hal Moore immediately demanded that he be paid a “management fee” by Munson-Hardisty in the amount of $20,000 per month, despite his knowledge that HUD rules did not permit such a payment to a project investor/owner. [*Id.* at ¶33]. Payment of this unwarranted fee to Hal Moore directly contributed to the cash shortfall on the Project, by substantially depleting the loan funds that had been designated by HUD for the Project, and for Munson-Hardisty’s general overhead. [*Id.*]. As soon as the HUD financing for the Project closed, Hal Moore also began to assert control over the Project, including

complete control over all financial aspects of the Project and of Munson-Hardisty. [*Id*. at ¶38]. The Moores essentially ousted Plaintiff Hardisty and his partner John Munson from the operation of the Project and removed their decision making authority. Hal Moore demanded that he personally approve all construction bids, and put his employee, Mark Peluso, in control of Munson-Hardisty's and the LLC's accounting and business operations. [*Id*. at ¶39]. Hal Moore required that Melanie Moore and Mark Peluso be given the password for Munson-Hardisty's computer and accounting software, and they used that access to control the amounts paid to the suncontractors and when such payments were made. [*Id*.].

Even though Hal Moore was well aware that HUD required the Project to be completed for a fixed amount, he believed his own equity in the Project would be increased by incorporating numerous upgrades, including a redesigned pool and tennis courts. Hal Moore directed that these upgrades be included and also that they be paid from the construction funds that had been disbursed to Munson-Hardisty from the HUD loan, for payment of the HUD-approved construction expenses. Hardisty was concerned about the misapplication of these construction loan proceeds and expressed his concerns to Hal Moore. Hal Moore reassured Hardisty that everything would be fine, because he would reimburse Munson-Hardisty for those expenses. [*Id*. at ¶42-44]. John Munson was so concerned about the situation that he resigned. [*Id*. ¶44].

By June 2008, largely because of the upgrades Hal Moore required and the misapplication of the HUD loan proceeds to pay for them, the Project was approximately $500,000 short of the amount needed to pay the outstanding subcontractor invoices. [*Id*. at ¶45]. Hal Moore reneged on his repeated promises to pay the contractors for these amounts. Hal Moore's refusal to pay put Hardisty in a position where the contractors could assert a claim against the bond, which Hadisty had guaranteed. Faced with such duress, Hardisty conceded to Hal Moore's demand, contrary to his earlier promises, that Munson-Hardisty execute a promissory note to

Hal Moore in the amount of $655,000, in exchange for the cash to pay the then-unpaid contractor invoices. This note was to be repaid by Munson-Hardisty on or before May 1, 2009. [*Id*. at ¶45].

By December 2008, it was clear that additional capital above and beyond the $655,000 was going to be required to complete the Project. Hardisty was notified by Defendant Peluso that an additional $2 million would be needed just to cover the cash flow through February 2009. [*Id*. at ¶46]. Because of Hal Moore's familiarity with Hardisty's financial situation, he was well aware that Hardisty did not the ability to meet that obligation, and he demanded that Hardisty transfer his remaining 27% interest in the LLC to him, in exchange for Hal Moore's payment of the amount needed to complete the Project. While he continued to reassure Hardisty that he would ultimately reimburse him and Munson-Hardisty for the upgrades he had insisted on, Hal Moore also threatened Hardisty that he would walk away from the Project, leaving the subcontractors unpaid and triggering a ruinous bond claim, unless Hardisty agreed to his demand. [*Id*. at ¶46].

Faced with such duress, Hardisty had no choice but to concede to Hal Moore's demands. In January 2009, Hardisty was presented with a rapid-fire succession of proposed deal terms for a restructuring of his and Hal Moore's relative ownership percentages. First, on January 5, 2009 he was presented with an intial draft of a letter of intent. See Exhibit 5 to Amended Complaint. Next, on January 15, he was presented with a revised letter of intent. See Exhibit 6 to Amended Complaint. Hardisty, under substantial economic pressure, entered into a Letter of Intent (titled "Incentive Agreement"), which provided that Hardisty would transfer his 27 percent membership interest in the LLC to Hal Moore. The Letter of Intent was drafted by Melanie Moore, and it included false statements regarding the amounts Hal Moore had contributed to the Project. The Letter of Intent also acknowledged the duress that Hardisty was under, that is, that Hardisty was subject to personal liability under the

performance bond if payment to the subcontractors was not made (indicating that the very reason Hardisty was giving up his membership interest was to be *relived* of this risk). The Letter of Intent also specifically recited that Hardisty *would be repaid* the sum of $380,000 that he had personally been required to contribute to the Project and that Hardisty would receive certain bonuses if set completion deadlines were met. [*Id*. at ¶47]. Hardisty signed the Letter of Intent. Melanie Moore represented that Hal Moore had done so as well, although Mr. Hardisty never received an executed copy, despite repeated requests to Melanie Moore for the fully-executed Letter of Intent. [*Id*. at ¶48].

On January 22, 2009, Melanie Moore contacted Hardisty and represented that, in order to satisfy HUD requirements, the parties needed to enter into a more formal agreement than the Letter of Intent, which she said she needed "immediately." [*Id*. at ¶49]. Melanie Moore came to Hardisty's office and presented him with a Purchase and Sale Agreement, which she represented contained "nothing new," that is, it contained the same terms as the Letter of Intent. [*Id*.] Melanie Moore also insisted that the document be executed by Mr. Hardisty on the spot, as she needed to send it to HUD. [*Id*.]. Melanie Moore lied. The Purchase and Sale Agreement was significantly different than the Letter of Intent. Instead of Hardisty transferring his remaining 27% in the LLC to Hal Moore in return for Hal Moore's assumption of all remaining amounts needed to finalize the Project, the Purchase and Sale Agreement provided that Hal Moore's wholly owned company, Defendant State Insulation, would purchase and retain by assignment all of the claims of the unpaid contractors, and that State Insulation would be able to make a claim against the bond in lieu of the subcontractors. [*Id*. at ¶50]. Moreover, Hardisty received no compensation under the Purchase and Sale Agreement for the transfer of his remaining interest in the LLC, nor did the agreement contain any obligation on the part of Mr. Moore or his entities to reimburse Mr. Hardisty for his $380,000 contribution. This was entirely contrary to

the point of the deal under which Hardisty had agreed to give up his 27% membership interest—that is, that he might be relieved of liability for subcontractor claims against the bond and his contribution would be released to him.

State Insulation presumably proceeded to pay the subcontractors on the outstanding invoices, requiring each of them to sign a Collateral Assignment of their claims. In addition State Insulation obtained *lien releases*, in conncection with each Collateral Assignment. [*Id*. at ¶52]. Because lien releases were obtained from the subcontractors in connection with the Collateral Assignments, Munson-Hardisty (and Hardisty as guarantor) would be released from liability with respect to the bond, when the subcontractors executed the releases.

Despite having obtained these lien releases, and after he had represented under penalty of perjury to HUD that all but a minimal amount of subcontractor claims on the Project remained outstanding, Hal Moore asserted false claims against the bond, by subsequently causing State Insulation to file a complaint against the bonding company for the Project in October 2009 in an attempt to collect approximately $2.2 million on the bond.[1] [*Id*. at ¶53]. This suit named Hardisty, his ex-wife, and several of Hardisty's businesses, each of whom had guaranteed payment of the bond. [*Id*.] Concurrently, Hal Moore instituted foreclosure proceedings on Hardisty's real properties, including a vacation home in Mammoth Lakes, California, that Hardisty purchased as an investment and leased out for ten months of the year. [*Id*. at ¶54].

The filing of the false bond claim by Hal Moore was for the sole purpose of harassing Hardisty. Hal Moore wanted to ensure that Hardisty's capital was tied up so that he would be unable to pay back the notes that were secured by Hardisty's properties, so that Hal Moore could foreclose. Hal Moore wanted also to ensure that Hardisty would not have the financial wherewithal to defend himself or to try to sue for recovery of his lost investment in the Project. As a direct and proximate result of

[1] That action is currently pending in the Chancery Court for Knox County, Tennessee as *Great American Ins. Co. v. State Insulation, et al.*, Case No. 1814023.

Hal Moore having caused State Insulation to make a false and fraudulent claim against the bond—that is, after the subcontractor liens had been discharged and thus there could be no valid basis for such a claim—Hardisty and his entities have been prevented from receiving back their $380,000 contribution, have been unable to obtain additional performance bonds, and thus have been substantially precluded from working in the construction industry. [*Id*. at ¶55]. This has obviously had a devastating effect on Hardisty and constitutes the largest item of damages. [*Id*. at ¶53].

In the end, Hardisty was left without assets, without his sweat equity in the Project (that is, his 27% interest), and without his home and other properties as a result of the Defendants' frauds and wrongful acts. In contrast, Hal Moore and his cohorts –Melanie Moore and his staff accountant, Mark Peluso – have unjustly and improperly obtained control of Legacy Pointe LLC, and stand to reap the substantial long-term profits that will be received from its operations.

## II. ARGUMENT AND AUTHORITIES

### A. Standard of Review

A motion for summary judgment is properly granted only when there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must view "the evidence in the light most favorable to the nonmoving party." *Gonzalez v. Millard Mall Services, Inc.*, 2012 WL 727867 (S.D. Cal) (quoting *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001)):

> [A]t this stage of the litigation, the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial.

*Domingeuz-Curry v. Nevada Transportation Department,* 424 F.3d 1027, 1036 (9th Cir. 2005) (internal quotations omitted). When this standard is applied to the facts of the case at bar, it is clear that the Defendants' Motion should be denied.

**B. A Confidential Relationship Existed between Moore and Plaintiff**

The Defendants' arguments with regard to the Plaintiff's claims for fraud, constructive fraud, quiet title, securities fraud, conversion, conspiracy and aiding and abetting depend as a threshold matter on the allegation that Plaintiff Hardisty was not entitled to rely on the representations of the Defendants, in particular Defendant Hal Moore. To the contrary, as this Court determined in connection with the Defendants' Motion to Dismiss certain causes of action in the Plaintiff's Second Amended Complaint, the Plaintiff has alleged sufficient facts to support a finding of a confidential relationship between Mr. Hardisty and Hal Moore. In so holding, the Court stated as follows:

> Here, the Court finds that Plaintiff has adequately alleged the existence of a confidential relationship with Defendant Hal Moore. Plaintiff has stated facts relating to his trust and confidence in Mr. Moore based in large part on their longstanding friendship and business history. Mr. Moore had access to Plaintiff's confidential personal financial information and position at M-H. (SAC ¶¶ 12-17). As in *Tyler*, 29 Cal. App. 4th at 549, Mr. Moore "gained the confidence of Plaintiff" and "purported to advise with Plaintiff's interest in mind." Further, in assuming control of M-H, Mr. Moore obtained control of Plaintiff's property, placing him in a superior position. In such a relationship, "the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert influence over the dependent party." *Gibson v. Gov't Employees Ins. Co.*, 162 Cal. App. 3d 441, 445 (1984). Finally, the SAC alleges facts that demonstrate the presence of a joint venture between Plaintiff and Mr. Moore. (SAC ¶¶ 45-82). The Court finds that the alleged conduct does rise to a confidential relationship necessary for a constructive fraud claim.

[Doc. 33, p. 5]. This determination was clearly correct, as set forth in the Declaration

of Plaintiff Hardisty.

As Defendants admit, "[a] confidential relationship may exist to support a claim for constructive trust whenever 'a person with justification places trust and confidence in the integrity and fidelity of another." Motion at 17 (quoting *Odorizzi*, 246 Cal. App. 2d at 129). In the early case of *Robbins v. Law*, 48 Cal.App. 555 (1920), the court held as follows:

> The term "confidential relations" is ordinarily understood to apply to the relations established by law between attorney and client, husband and wife, guardian and ward, and other legal relations of this character, but courts of equity have been careful not to fetter their own jurisdiction by defining the limits of this relationship. It is not confined to the strict fiduciary relationship existing between those having certain definite, well-recognized legal relations of trust and confidence, but is often said to extend to every possible case in which a fiduciary relation exists as a fact. The relation need not be legal; it may be moral, social, domestic, or merely personal.

*Id.* at 560. *See also Vai v. Bank of America National Trust and Savings Assn.*, 56 Cal.2d 329, 338 (1961) (holding that "[t]he simultaneous existence of a confidential relationship based on trust and confidence and a fiduciary relationship arising out of control of property of another is readily apparent in many common associations – principal and agent, attorney and client, business partners, to name a few").

In *Bank of America v. Sanchez,* 3 Cal.App.2d 238 (1934), the court cited *Robbins* approvingly for the same proposition, and then, significantly for purposes of this case, went on to state that:

> It has been many times held by our appellate courts that to entitle one to relief on the ground of fraud it is sufficient to show the existence of such *friendly relations during a period of several years between the parties as would entitle the injured person to place confidence in the integrity and honesty of the other party* to a contract and in the truth of whatever representations the latter made to the former with regard to the transaction between them.

*Id.* at 242 (emphasis added). This is precisely the circumstance presented in this case. Defendant Hal Moore's representations to the contrary notwithstanding, he and the

Plaintiff had a long and exceptionally close relationship. The Plaintiff viewed Mr. Moore as both a mentor and a father figure, and implicitly trusted his representations. He confided about his finances in Moore. Hardisty was invited to weddings and other Moore family celebrations. He knew Moore's marital problems. He has spent enough time with Moore to know his favorite foods and drink. Moore loaned Hardisty a considerable amount of money and helped him establish a line of credit at Moore's own bank. [*See* Hardisty Declaration ¶¶1-14.] He virtually controlled Munson-Hardisty, even to the extent of having passwords to its computer systems. [Id. ¶¶39-41.]. This was a confidential relationship in the sense understood under *Sanchez.* Plaintiff Hardisty's claims must necessarily be evaluated against this backdrop.

**C. Fraud**

The Defendants assert that Plaintiff Hardisty cannot establish two of the elements of fraud as a matter of law: justifiable reliance and an actionable misrepresentation. To the contrary, the unique factual circumstances of this case raise at least a question of fact on this issue, and require that the Plaintiff's fraud claims be submitted to the jury for determination. The Defendants first contend that the Plaintiff is bound by the express terms of the promissory notes and trust deeds he executed at the behest of the Moore Defendants, and cannot rely on any contradictory representations made by the Moores. While this may be true as a general proposition, "[t]his presumes, however, that the parties were dealing at *arm's length.* When the parties are in a fiduciary relationship, the same degree of diligence is not required of the non-fiduciary party." *Brown v. Wells Fargo Bank, NA,* 168 Cal.App.4th 938, 959 (2008) (emphasis in original).

Moreover, the Defendants' Motion ignores entirely the issue that Hardisty alleges that he was fraudulently *induced* to enter the notes and agreements. Under California law, the elements of a fraudulent inducement claim are: (a) misrepresentation; (b) scienter; (c) intent to defraud; (d) justifiable reliance; and (e)

resulting damage. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638, 909 P.2d 981 (1996). The plaintiff's claim for fraudulent inducement does not depend on the enforcement of the terms of the contract—it exists as a separate tort. *Id*. Moreover, in California, integration clauses do not bar fraudulent inducement theories as a matter of law. *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 301, 37 Cal. Rptr. 3d 364 (2005). Parol evidence may be introduced to show such fraud. *Id*. Recently, the California Supreme Court has broadened this principle, holding that parol evidence (e.g. evidence like an oral agreement) may be used to show that a written contract was procured by a fraudulent statement even though the statement directly contradicts the express terms of the final, executed written contract. *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.*, 55 Cal. 4th 1169, 151 Cal. Rptr. 3d 93, 291 P.3d 316 (2013). As a result, fraud, without restriction, is admissible to challenge the validity of a written agreement.

The Plaintiff here was fraudulently induced to enter the written agreements that exist in the record. Plaintiff is entitled to introduce parol evidence of the false representations and to have a jury determination as to whether his reliance on the false representations of the Defendants, particularly Defendants Hal and Melanie Moore, was justified. As set forth in the Declaration of John T. Hardisty filed in connection with this Opposition, those representations include:

(1) whether Defendant Hal Moore represented to the Plaintiff that his security for the $1.5 million loan – the deeds of trust recorded against the home and business properties of the Plaintiff - was to be short-term and in place only until Mr. Moore was approved by HUD and became a member of the LLC;

(2) whether the Defendants maliciously and wrongfully refused to provide Plaintiff with a copy of the deeds of trust to ensure that Plaintiff would not discover the dragnet clause contained therein;

(3) whether the Moore Defendants wrongfully refused to release the deeds of

trust after HUD issued its letter of approval for Hal Moore in November 2007;

(4) whether Hal Moore wrongfully and in violation of HUD requirements required the Plaintiff to cause Munson-Hardisty to make "management fee" payments to Defendant Moore from Munson-Hardisty's allocated overhead for the Project, effectively destroying Munson-Hardisty's ability to complete the Project as planned;

(5) whether the Moore Defendants made certain misrepresentations to Plaintiff Hardisty in connection with the promissory note in the amount of $750,000, executed to cover the bonding requirements, to the effect that the note would not need to be repaid until the bond had been released by Great American and the deposit refunded;

(6) whether Defendant Hal Moore breached his express promise to Plaintiff Hardisty to reimburse him for the $380,000 required to be drawn on Plaintiff's line of credit, which breach deprived the Plaintiff of necessary operating capital for any further construction projects; and

(7) whether the extra enhancements to the Project were performed at the behest, and contingent upon the promise to pay, of Defendant Hal Moore.

These are all issues that are central to the resolution of this case, and all of which raise factual questions as to the propriety of the Plaintiff's reliance on the Moore Defendants. Plaintiff Hardisty contends that, given the fiduciary/confidential nature of his relationship with Defendant Hal Moore, none of these questions can be resolved as a matter of law as urged by the Defendants, and the Defendants' Motion must be denied.

The case law relied on by the Defendants in support of their argument does not change this result. *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025 (9th Cir. 1992), involved Atari's acquisition of the Federated Group, Inc. During the due diligence performed by Atari prior to the acquisition, Atari's chief financial officer reviewed Federated's financial information and determined that the company was grossly

overvalued. Despite the CFO's continuing concerns, and because the defendants assured Atari that Federated was financially sound, Atari closed the deal, and ultimately filed suit against the defendants, the accounting firm for and officers of Federated, for securities and common law fraud, among other claims.

On the basis of those facts, the district court granted summary judgment to the defendants, which determination was affirmed by the Ninth Circuit. In so holding, the appellate court emphasized that the injured party "may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth…." *Id.* at 1030 (emphasis omitted). There is no analogous situation in the case at bar. The representations of the Moore Defendants were not preposterous in any sense of the word when made. Plaintiff Hardisty did not, and because of the Defendants' concealment generally could not, discover their falsity until it was too late.

*Elkind v. Woodward*, 152 Cal.App.2d 170 (1957), is similarly inapplicable. The court found that Plaintiff Elkind had sufficient information and had performed a sufficient investigation prior to his purchase of a bar to be on notice of the actual gross proceeds. "[T]he facts show the necessary information was readily available to the plaintiff. The defendants were willing to supply any needed material and the investigation proceeded without hinderance." *Id.* at 177. Just the opposite was true in this case. The Defendants were never forthcoming and open about their demands with regard to Hal Moore's investment in the Project, and generally did not inform the Plaintiff of those demands until the very last minute. Hardisty was always told to sign documents immediately or there would be drastic repercussions, such as no checks sent to subcontractors, there would be a bond default, or Hal Moore would abandon the Project. Likewise, Defendants constantly used a "bait and switch" tactic on Hardisty—after the agreement had been made, Hardisty was handed new documents

to sign with ever more egregious terms. Hardisty was always required to sign on the spot, and was told that the documents contained nothing unusual or new. The signature requests were generally timed at a moment when Hardisty was distracted with the Project or when a critical financial deadline was looming. For example, in connection with the above-referenced Letter of Intent executed in January 2009, Hardisty was presented with three different documents in a very short period of time, during a time-frame when Hardisty was constantly traveling from California to Tennessee. Hardisty was afforded no realistic opportunity to discover the Defendants' fraud in time to protect himself therefrom. Given the Plaintiff's fiduciary and confidential relationship with Defendant Hal Moore, his claims should be submitted to the jury for determination.

**D. Constructive Fraud**

The Defendants make essentially the same arguments with respect to the Plaintiff's claim for constructive fraud pursuant to Cal. Civ. Code § 1573, arguing that he cannot establish the essential elements thereof, primarily a confidential or fiduciary relationship, and justifiable reliance upon representations in light of that relationship. *Odorizzi v. Bloomfield School District*, 246 Cal.App.2d 123, 129 (1966). As discussed above, the Plaintiff has more than sufficiently alleged a confidential or fiduciary relationship in this case, as this Court has previously so found. There is simply no basis for the Defendants' current allegation that Mr. Hardisty and Mr. Moore were nothing more than casual business acquaintances who had a cordial relationship. [Motion at 17]. This contention is completely belied by the facts as set forth in the Hardisty Declaration. However, to the extent any doubt remains, the issue should be decided by the jury.

The same is true with regard to the Defendants' contentions that the Plaintiff cannot establish either nondisclosure or reliance because the transactions were in writing. The Plaintiff again asserts that the Defendants made numerous

representations concerning the content of the documents which were completely false, and that Plaintiff often was required by the Defendants and the circumstances to execute the documents without time for review. Parol evidence of these representations can be introduced, despite the content of the agreements and/or notes. *Riverisland Cold Storage, Inc.*, 55 Cal. 4th at 1169. Plaintiff also contends that his actions were reasonable in light of Mr. Moore's fiduciary/confidential status, and that at minimum, there is a fact question on this issue precluding judgment as a matter of law in favor of the Defendants.

**E. Quiet Title**

The Plaintiff's cause of action for quiet title is similarly premised on the misrepresentations of the Moore Defendants, particularly Defendant Hal Moore, concerning the terms of the 2007 deeds of trust on the Plaintiff's home and business properties. As discussed above, the Plaintiff was assured by the Moores that the deeds of trust were short term, and intended to remain in effect only until Defendant Hal Moore was accepted by HUD as a member of the LLC building the Project. Unbeknownst to the Plaintiff, the deeds of trust contained a broad clause rendering them applicable to all future loans and allowing the deeds to be used as leverage by the Moore Defendants against the Plaintiff. As a result, while the deeds may be facially valid, there is a significant question as to whether they were fraudulently procured. *See* 55 Cal. 4th at 1169.

In addition, the Moores required that the deeds be executed at a time when the Plaintiff was under significant pressure to obtain funds to close the HUD loan, lest he lose the Legacy Pointe project. Given the Plaintiff's close and confidential relationship with Hal Moore, these allegations are more than sufficient to present a question of fact for the jury.

**F. Securities Fraud**

The Defendants correctly state that, in order to state a valid cause of action for

securities fraud pursuant to Cal. Corp. Code § 25410, *et. seq.*, the Plaintiff must establish that "there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading." *MTC Electronic Technologies Co., Ltd. v. Leung*, 876 F.Supp. 1143, 1147 (C.D. Cal. 1995). This is precisely what Plaintiff Hardisty has alleged, and what the evidence in this case will prove. The Plaintiff's claim for securities fraud is based on Defendant Hal Moore's misrepresentations in connection with his purchase of Plaintiff's remaining 27% interest in the LLC, in which Defendant Moore promised to reimburse the Plaintiff the $380,000 from his line of credit, and Mr. Moore's representations that he would personally be responsible for the payment of all extras on the Project. The Plaintiff asserts that he was entitled to rely on Mr. Moore's representations given their relationship, and did so to his extreme detriment. Again, at the very least this presents a fact question for the jury that cannot be resolved on summary judgment.

### G. Conversion

The same is true with regard to the Plaintiff's claim for conversion. The Defendants argue that the Plaintiff consented to the transfer of his 27% interest in the LLC in reliance on the terms of the Purchase and Sale Agreement. However, in connection with the execution of the agreement, The Plaintiff asserts that Defendant Hal Moore promised to reimburse him the $380,000 he was required to draw from his line of credit to contribute to the Project. In fact, the Plaintiff contends that the Moores had no intention of fulfilling this promise to him, and made it only to induce him to part with his remaining share of the LLC. Such parol evidence may be introduced. *See* 55 Cal. 4th at 1169. The Plaintiff asserts that the evidence will establish the reasonableness of his reliance on Hal Moore's representations under the unique circumstances of this case, and his claim for conversion should be presented to the jury for determination.

**H. Conspiracy and Aiding and Abetting**

Finally, the Defendants assert that the Plaintiff will not be able to prove his causes of action for either conspiracy or aiding and abetting as a matter of law, because he has allegedly failed to establish the underlying torts or primary wrong with regard to both claims. In light of the arguments set forth above, in which the Plaintiff establishes that his underlying claims should be allowed to go to the jury, the Defendants' Motion should be denied on these issues as well.

**I. Abuse of Process**

In their only argument that does not center on the confidential or fiduciary relationship issue, the Defendants contend that Plaintiff Hardisty's cause of action for abuse of process should be dismissed, allegedly because the Plaintiff cannot establish anything more than the filing of the Complaint by State Insulation against the bonding company. Once again, the Defendants are simply incorrect.

California law is long established that:

> the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in and of itself for an end other than that which it was designed to accomplish. ***The purpose for which the process is used, once it is issued, is the only thing of importance.***

*Spellens v. Spellens,* 49 Cal.2d 201, 232, 317 P.2d 613 (Cal. 1957) (emphasis added). *See also Younger v. Solomon,* 38 Cal.App.3d 289, 297 (Cal. App. 1974) (holding that abuse of process involves a "perversion of the judicial process to the accomplishment of an improper purpose," and that "generally, an action lies only where the process is used to obtain an unjustifiable collateral advantage").

As an initial matter, the lawsuit on the bond filed by State Insulation was in fact not justified "in and of itself." First and foremost, the purpose of the payment bond was to discharge any *liens* against the Projnect arising from non-payment of subcontractor claims. As stated above, the Collateral Assignments were executed in conjunction with a release of the lien by the subcontractor. Because the liens were

discharged in conjunction with the Collateral Assignments, there could be no proper grounds for a claim against the bond by the assignee, State Insulation. Rather, all that State Insulation held as a result of the Collateral Assignments was a bare claim against Legacy Pointe. Because Hal Moore controlled both the creditor, State Insulation, and the debtor, Legacy Pointe, the claim was rendered a nullity by the doctrine of merger.

Second, even assuming *arguendo* that any bond claim could have existed absent a lien, the language of the bond is clear and unequivocal that State Insulation is not a proper claimant.

> A claimant is defined as one having a ***direct contract with the Principal or with a subcontractor of the Principal*** for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the contract.

[Payment Bond, attached hereto as Exhibit 1].

State Insulation performed no work whatsoever for either Munson-Hardisty, as the owner of the Project and the Principal as set forth in the bond, or any of the subcontractors on the Project. Rather, as the Defendants concede, State Insulation paid the subcontractors and received an assignment of their claims. While this may give State Insulation the right to proceed against Munson-Hardisty, as the owner of the Project, State Insulation was not entitled to proceed to against the bond to recover its payments as a matter of law by the very terms of the bond. *See Wasatch Bank of Pleasant Grove v. Surety Insurance Company of California,* 703 P.2d 298, 300 (Utah 1985) (construing identical bond language to "exclude from coverage those who merely loan money to the principal for the payment of labor or materials, rather than providing labor or materials themselves").[2]

The fact that the Moores caused State Insulation to file such a frivolous lawsuit

[2] This Court should note that Munson Hardisty, LLC, a Defendant in the bond action pending in Tennessee, had filed a Motion for Summary Judgment on this issue, which Motion is scheduled to be heard on December 16, 2013.

on the bond—where there was no valid basis for a claim *and*, in the face of explicit language in the bond precluding such a claim—establishes the improper purpose required for the tort of abuse of process. The Defendants' assertion that they "filed the action to properly seek recovery under the bond and not to obtain an unjustifiable collateral advantage," [Motion at p. 21], is therefore a complete misstatement under the facts of this case and should be rejected by this Court.

Moreover, as this Court found [Doc. 33], the "use of civil litigation as a weapon to damage another's business, besides being an intolerable waste of judicial resources, may give rise to independent causes of action in tort for abuse of process and malicious prosecution." *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 309 (Utah 1982). In *Leigh Furniture*, the Supreme Court of Utah recognized the tort of intentional interference with prospective economic relations, and found that the plaintiff's conduct supported the jury's verdict against them on that claim.

> There was ample evidence that Isom had business relationships with various customers, suppliers, and potential business associates, and the Leigh, the former owner of the business, understood the value of those relationships. There was also substantial evidence that the Corporation, through Leigh, his wife, and his bookkeeper, intentionally interfered with and caused a termination of some of those relationships (actual or potential).

*Id.* at 306.

California has also adopted the tort of intentional interference with prospective economic advantage, and has articulated the elements as follows:

> (1) An economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 63 P.3d 937, 950 (Cal. 2003). In addition to the above elements, the California Supreme Court emphasized that "specific intent is not a required element of the tort of interference with

prospective economic advantage." *Id.* at 951.

> While a plaintiff may satisfy the intent requirement by pleading specific intent, *i.e.*, that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

*Id*.

There can be no serious question that all of the elements of interference with prospective economic advantage are met in the case at bar. Plaintiff Hardisty and his entities had existing relationships and opportunities to bid on and win future construction projects, as the Plaintiff's expert has so found. Given the Defendants', particularly Defendant Hal Moore's involvement with the Plaintiff and comprehensive knowledge of the Plaintiff's business, the Defendants necessarily knew of those business prospects. In addition, Defendant Hal Moore's lengthy career in the construction industry would have made him well aware of the necessity and importance of bonding, particularly for smaller entities like those of Plaintiff Hardisty, and the adverse effect a bond claim would have on those entities. The adverse impact was in fact severe, and has been estimated by Plaintiff's expert as in excess of $8.5 million. Because this damage was substantially certain to occur if a bond claim was made by State Insulation, the intent element is met as well. As a result, the Plaintiff has easily satisfied the improper purpose/collateral advantage requirement for his abuse of process claim, and the Plaintiff's claim should properly be presented to the jury for determination.

This Court has also previously declined to dismiss the Plaintiff's abuse of process claim for the same reasons set forth above. [Doc. 33]. In so holding, the Court found that "[i]t is plausible that Defendants instituted suits with an ulterior motive and wrongfully used the process to coerce an unjustifiable collateral advantage. Thus, it appears that there is an issue as to whether the State Insulation Complaint filing was a 'mere' filing or to be used as a threat of litigation to extort valuable assets from

Plaintiff." *Id.* at p. 9. This holding was clearly correct and the Defendants have argued nothing that would warrant a contrary determination. Accordingly, the Defendants' Motion for Summary Judgment on the Plaintiff's abuse of process claim should be denied.

## III. CONCLUSION

Accordingly, in light of the foregoing, Plaintiff John T. Hardisty respectfully requests that the Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment, be denied, and the case be allowed to proceed to trial on the merits.

Dated: December 23, 2013

/s/ William B. Federman
William B. Federman
*(admitted pro hac vice)*
FEDERMAN & SHERWOOD
10205 N. Pennsylvania
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com

- and –

2926 Maple Avenue, Suite 200
Dallas, TX 75201

Ali M.M. Mojdehi, Esq. (CA SBN 123846)
Janet D. Gertz, Esq. (CA SBN 231172)
**COOLEY LLP**
4401 Eastgate Mall
San Diego, California 92121-1909
Phone: 858.550.6055
Fax: 858.550.6420
amojdehi@cooley.com
jgertz@cooley.com

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I, Janet Dean Gertz, declare:

On December 23, 2013, I served the above pleading using the court's CM/ECF system pursuant to Local Rule. The above pleadings were electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the person's listed below:

Gary Edward Scalabrini
Gibbs Giden Locher Turner & Senet LLP
1880 Century Park East
12th Floor
Los Angeles, California 90067-1621
Telephone: 310.552.3400
Facsimile: 310.552.0805
gscalabrini@gglts.com

Executed on December 23, 2013.

/s/ Janet Dean Gertz____________
Janet Dean Gertz
jgertz@cooley.com