William B. Federman, Esq.
(*admitted pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73008
Phone: 405.235.1560
Fax: 405.239.2112
wbf@federmanlaw.com
jdw@federmanlaw.com

Attorneys for Plaintiff John T. Hardisty
*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOHN T. HARDISTY,

Plaintiff,

v.

HAROLD MAXINE MOORE; ELAINE K. MOORE (aka MELANIE K. MOORE); STATE INSULATION, LLC, an Arizona limited liability company; STATE INSULATION, LLC, a Nevada limited liability company; THE 1998 HAROLD M. MOORE REVOCABLE TRUST; and MARK PELUSO, an individual,

Defendants.

---

HAROLD MAXINE MOORE,

Counterclaimant,

v.

JOHN T. HARDISTY,

Counterdefendant.

Case No. 3:11-cv-01591-AJB-BLM

**DECLARATION OF JOHN T. HARDISTY IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, JOHN T. HARDISTY, declare as follows:

1. I became acquainted with Harold Maxine ("Hal") Moore in approximately 1983. At the time, I was involved in building in-fill projects on vacant lots in the beach areas of San Diego.

2. Hal was in the drywall business, and his company did the insulation and drywall on my very first project, and virtually every project of mine from that point forward.

3. I first went to work directly for Hal and his companies two separate times between 1986 and 1989. While working for him, Hal allowed me to sit in on meetings with his other managers and divisions of his companies, and told me to keep quiet and listen, so I could learn something. Hal also indicated that I should keep whatever I heard in strictest confidence.

4. Hal fired me in a fit of anger both times when I refused to do what he wanted. I believed Hal was spending money on unnecessary and inappropriate items for the project we were doing, and expressed that to him. However, our relationship always continued as if the firings had never happened. Hal continued to contact me on a regular basis, and I visited him in his office frequently.

5. We would often have lunch or meet for drinks after work. Hal has a sweet tooth, and would always order dessert with lunch. His beverage of choice was Canadian Club whiskey, and he kept the bar in his office supplied with it. Hal and I would discuss my business prospects during these outings, as well as potential

projects that we could do together. I respected Hal's opinion, and frequently looked to him for ideas and advice. Hal also continued to do all of my drywall and insulation for my projects.

6. I was an excellent carpenter and hands-on superintendent of construction projects, but was not initially knowledgeable about the endless documentation that went along with being in the construction industry as a large contractor, such as financial statements, balance sheets, lines of credit, operating capital requirements and the many legal documents that would be used from time to time depending on the job. As a CPA, Hal was very familiar and comfortable with those aspects of the business, and encouraged me to come to him with any questions I might have. I did, and he was an enormous help to me.

7. Hal and I were also friends outside of our business relationship. Hal has been married multiple times, and I was his confidante during his marriage and divorce from his third wife, Judy. Hal married Judy without the benefit of a prenuptial agreement, so the divorce was trying and bitter for him. I was also invited to Hal's house to celebrate his engagement to Defendant Melanie Moore, and to their wedding on a boat in San Diego. Hal sent the wedding invitation in a bottle because Donald Trump had done so.

8. My wife and I often attended Christmas parties hosted by Hal personally and his companies. Hal also took us to a Chargers playoff game in his club seats.

9. By 2001, my construction company was going well and, as a result, I was

doing some surety work (job completions) for the bonding companies. One of those companies, Insurance Company of the West, asked me to complete three drywall jobs for a company that had taken bankruptcy. In order to do the project, I needed a line of credit, which Hal helped me establish at his bank, City National Bank. In doing so, Hal reviewed and helped me organize all of my personal and business financial statements, tax returns and balance sheets, and became intimately familiar with my finances. From that point forward, Hal had a binder with all of my personal and my companies' information, with yearly and as needed updates, and would advise me as things improved or changed.

10. As a result of the surety work from 2003 on, my drywall company began to grow, and the business was doing quite well. I needed additional help, and hired a former employee of Hal's who eventually began embezzling money from the business. This employee embezzled almost $800,000 before he was discovered.

11. By the spring of 2005, I was unable to pay the company's material bills on time as a result of the embezzlement, and the company was in trouble. Hal heard of my predicament from the material suppliers, and called to offer assistance. Hal advised me against taking bankruptcy, and wrote me a personal check for $175,000 on the spot to fund the company payroll. Hal also used his influence with the material suppliers to ensure that the company received the materials needed to continue operations, while he advised me and we decided what I needed to do.

12. Hal and I were in constant contact that summer while he was at his

vacation home in Washington State. We talked on the telephone almost every day, and met in person every time he came home to San Diego. Hal ultimately personally loaned me and the company over $1,000,000 to continue operations and handle the litigation against the embezzling employee.

13. In order to ensure that the money was being wisely spent, Hal required me to provide him with detailed and regularly updated information with regard to my personal and my company's financial information.

14. In January 2006, I personally advanced money, signed a lease and qualified Hal's new company, Empire Insulation, Inc., to do business in California. Hal operated that company from my office for several years, rent free. I separated from Empire Insulation, Inc. in April 2008.

15. In June 2007, I received a telephone call from my long-time friend John Munson regarding Legacy Pointe LLC and the Legacy Pointe Project, and believed it to be a potentially lucrative investment.

16. I negotiated and structured a deal with the then owner, who had insufficient capital to close on the loan and complete the Project, to become the majority equity partner of the LLC.

17. At this same time, John Munson and I formed Munson-Hardisty to act as the general contractor and builder of the Project.

18. I ultimately obtained a 27% membership interest in exchange for my contribution of "sweat equity," and was offered an additional 50% interest if I could

make an addition $1.5 million cash contribution. Munson-Hardisty received a 10% membership interest.

19. In August 2007, I had several other individuals interest in investing in the Project, but none of them had the cash on hand and would have had to obtain financing to make the investment, which would have been problematic given the short HUD time frame.

20. Around August 16, 2007, as was customary during our long relationship, I was discussing the Project with Hal Moore during one of our regular conversations. Hal eventually expressed an interest in the Project, and asked me to send him more information, including all of the HUD documents and requirements.

21. Not only did Hal Moore have the readily available cash to meet the HUD deadlines, but I preferred having him as a partner, as I trusted him completely and thought his expertise and knowledge would be invaluable.

22. We ultimately agreed that Hal Moore would make a short-term loan to me in the amount of $1.5 million, with the understanding that the money was to be Hal's capital contribution to the Project, and that Hal would receive a 50% membership interest in the LLC as soon as he was approved by HUD. Because the Project was under time constraints, as the original owner had previously extended the loan numerous times and no more extensions were going to be allowed by HUD, it was not possible to get Hal approved as a member before the required closing date.

23. On August 15, 2007, the parties began circulating a draft Memorandum

of Understanding regarding Hal's investment in the LLC. All correspondence, including drafts of the MOU, was sent through Melanie Moore, because Hal did not use a computer and hated email.

24. The firm commitment from HUD regarding the Project was set to expire on August 28, 2007, and the LLC could not close on the Project without the $1.5 million. Hal was of course well aware of this time constraint.

25. On August 20, 2007, Hal for the first time demanded that the $1.5 million loan be secured by a promissory note and deeds of trust on my residences and businesses. Hal assured me that the note was intended to be very short term, and would be cancelled and the liens released as soon as he was approved by HUD and received his membership interest in the LLC. Hal explained that the note was only for his protection in case I should be "hit by a bus."

26. I consented to the note and the deeds of trust, both because I trusted Hal Moore, and because we were all very anxious to ensure that the Project closed.

27. I did not consult with a lawyer regarding the note and deeds of trust, nor any of the other documents at issue in this case. I was simply directed by Hal and Melanie to sign the documents, and was not given the opportunity to negotiate the terms.

28. One of HUD's requirements for the closing was for Munson-Hardisty, as general contractor, to obtain a payment and performance bond in the amount of approximately $18 million from Great American Insurance Company. I was required

to enter into an indemnity agreement as a surety for the bond, as was my wife and all of my business entities, including Legacy Pointe LLC and Munson-Hardisty.

29. Just days before the closing of the loan, Great American unexpectedly made the additional requirement that Munson-Hardisty deposit $750,000 in a certificate of deposit to ensure payment to the subcontractors on the Project. Because I was surprised by the demand, I initially thought the deal was over, but Hal wanted to go forward with the Project and decided to put up the money as security. Hal's sole condition for the funding was that interest on the CD be returned to him, to which of course I agreed.

30. Despite Hal's representations, when I met Melanie Moore at the Bank on September 11, 2007 to purchase the CD, she presented me with another promissory note containing the additional term that Hal Moore was to be guaranteed a minimum 13% return on the money, with any deficit to be paid by Munson-Hardisty. However, Melanie assured me that the note would not need to be repaid unless and until the CD requirement had been released by the bonding company, at which time the money would be returned to Hal Moore and my obligation considered satisfied.

31. Not only was the note not as represented by Hal Moore, but I was given no opportunity to review it or discuss it with Hal, as Melanie gave it to me while I was literally standing in line at the bank and under pressure to close the HUD loan, which opportunity would have been lost without the bond.

32. The HUD loan for the Project closed on September 13, 2007 and Hal was

approved as a member of the LLC on November 7, 2007.

33. When Hal received his membership interest, he immediately demanded that he be paid a "management fee" by Munson-Hardisty in the amount of $20,000 per month, or a 13% return on his investment, despite Hal's knowledge that HUD rules did not permit such a payment. Payment of this fee substantially depleted the loan funds that had been designated by HUD for the Legacy Pointe project.

34. As discussed above, Hal's $1.5 million contribution was supposed to be for his 50% interest in the Project, and should have been deemed repaid and released when his membership interest was approved by HUD, but Hal refused to do so. I was economically crippled from that point forward, and had no financial option bit to go along with Hal's demands. I also believed that the deeds of trust on my home and business properties were of no further force and effect once Hal received his membership interest, as that was what both Hal and Melanie had consistently represented to me.

35. I did not learn that the 2007 deeds of trust had not been reconveyed as promised until January 2008, when I was refinancing my house to take advantage of substantially reduced interest rates and was notified by Bank of America that the deeds had not be released.

36. I immediately contacted Hal and requested that the deeds be removed. Hal agreed that the deeds should have been released, but stated that his office had just been too busy to do so. Hal told me not to worry about it and that he would take care

of it. At this time, I was still unaware that the deeds of trust were also securing the promissory note for the $750,000 in the CD.

37. I emailed Melanie Moore in May 2008 to follow up on the deeds, and was again told that the office was busy, but that the deeds would be released as soon as possible. Hal and Melanie continued to reassure me in this manner until the end of 2008.

38. From the time Hal Moore received his equity interest in the LLC, he began to take over control of the Project, not only making all of the important decisions, but requiring Munson-Hardisty to pay very substantial project expenses that should have been paid by the LLC. For example, I was required to draw on my personal line of credit as set forth above to contribute $380,000 to the operating expenses of the LLC. As another example, several of the subcontractors on the Project were stealing a significant amount of construction materials. However, rather than allowing the LLC to make an insurance claim to recover the cost, Hal required Munson-Hardisty to pay for the replacement materials.

39. The Moores also began managing Munson-Hardisty as if they were the owners of the company, and basically ousted me and John Munson from any decision making authority. Hal took over the management and preapproval of all construction bids, and put Defendant Mark Peluso in control of Munson-Hardisty's accounting and business operations. Hal and Melanie went so far as to demand that Melanie and Peluso have the password for access to Munson-Hardisty's computer so they could

monitor the accounts.

40. Beginning in approximately May 2008, Hal Moore took total control over the project, and required that he personally review and approve all invoices before payment, even going so far as to refer to Munson-Hardisty funds as "his money." While Hal now denies the extent of his involvement, I have a multitude of documents indicating beyond dispute that Hal Moore affirmatively approved virtually every check that was written to pay Project expenses, despite his representations to the contrary.

41. In addition, Melanie and Mark Peluso used their access to the password to control the amounts paid to the subcontractors and to make those payments from the Munson-Hardisty accounts. Essentially from the beginning of the project, Hal, acting through Melanie and Mark Peluso, had to approve all draws, including who was paid, when and how much.

42. Even though Hal was well aware that Munson-Hardisty was required by HUD to construct the Project for a fixed maximum amount, Hal believed his own equity in the Project would be enhanced by incorporating numerous upgrades to make the Project more desirable, including a redesigned pool, tennis courts and a larger clubhouse, and required that these extra expenses be paid from Munson-Hardisty funds.

43. By July 2008, and largely because of Hal's extras, the Project was approximately $1.5 million over the budget allowed by HUD. Rather than submit

Change Orders to HUD for approval of the extras, which would have required depositing additional funds with HUD to cover the extras until the Project was completed and HUD gave final approval, Hal caused the payments to the subcontractors by Munson-Hardisty to be either delayed, reduced or not paid at all. The obviously prevented the Project from staying on schedule as represented to HUD. Because the draws from the HUD loan were dependent upon meeting the HUD schedule, Munson-Hardisty's cash flow was further depleted.

44. John Munson and I were very concerned about the extras and the effect they were having on the project budget. I voiced my concerns repeatedly to Hal, and was always promised that Hal would personally pay me and/or Munson-Hardisty for the changes he had made. John Munson was so upset about Hal's conduct that he resigned as Superintendent for the Project in October 2008.

45. By June 2008, the Project was approximately $500,000 short of the amount needed to pay the then outstanding subcontractor invoices because of the extra incorporated by Hal. Rather than pay the overages directly as he had repeatedly promised, Hal required me to sign another promissory on behalf of Munson-Hardisty in the amount of $655,000, which note was to be paid on or before May 1, 2009.

46. By December 2008, it was clear to everyone that additional operating capital was going to be required to complete the Project, and Mark Peluso notified me that an additional approximately $2 million would be needed just to cover the cash flow and extras through February 2009. Because he was intimately familiar with my

financial situation as well as that of Munson-Hardisty, Hal Moore knew that we had no financial ability to meet that obligation. While Hal continued to reassure me that he would reimburse me and Munson-Hardisty for the extras he had incorporated into the Project, he told me that he would walk away from the Project right then and refuse to pay the claims of the unpaid subcontractors, which he threatened would trigger a bond claim and potentially wipe me and my family out, unless I transferred all of my membership interest in the LLC to him.

47. I really had no choice but to do so given my financial situation at that time. As a result, in January 2009, I entered into a Letter of Intent which the Moores termed an “Incentive Agreement.” The Incentive Agreement falsely represented the amounts Hal Moore had contributed to the Project and expressly acknowledged that I was subject to personal liability under the performance bond with Great American if payments to the subcontractors were not made. However, the Incentive Agreement also specifically set forth that I would be repaid the $380,000 from my line of credit draw down upon completion of the Project, and provided that I would receive bonuses if the apartment building were completed according to a designated schedule.

48. I signed the Incentive Agreement and was assured that Hal Moore had done so as well. Although I requested an executed copy of the Agreement on numerous occasions, the Moores never sent me a copy.

49. In January 2009, I was traveling extensively. On January 22, 2009, Melanie Moore called me and said that she needed me to sign a more formal

agreement than the Incentive Agreement to satisfy HUD requirements, and that she needed it signed immediately. Melanie came to my office in San Diego and presented me with the Purchase and Sale Agreement, and demanded that I sign it without taking time to review it because she was in a hurry to get it to HUD. Melanie also assured me that the Purchase and Sale Agreement contained "nothing new."

50. As I later discovered, this was not the case at all. The Purchase and Sale Agreement provided that I would sell my remaining 27% interest in the LLC to Hal Moore in return for Hal's wholly owned company, State Insulation, purchasing and retaining by assignment all of the claims of the unpaid subcontractors in order to allow Hal Moore to make a claim against the bond in lieu of the subcontractors. Not only did I receive no compensation for the transfer of my remaining interest, the Purchase and Sale Agreement eliminated any obligation on the part of Hal to reimburse me for the draw on my line of credit in the amount of $380,000.

51. I executed an Assignment on February 28, 2009, transferring my 27% interest to Hal Moore.

52. As set forth in the Purchase and Sale Agreement, State Insulation paid the subcontractors' outstanding invoices and required them to sign a Collateral Assignment of their claims as a condition of payment, as well as lien releases.

53. Despite having obtained these lien releases, and after Hal Moore had represented under penalty of perjury to HUD that all but a minimal amount of subcontractor claims on the Project remained outstanding, State Insulation filed a

complaint against the bonding company in October 2009. As a guarantor of the bond, I have been named as a Defendant, as have my ex-wife and several of my business entities. Until the action is resolved and as long as State Insulation's over $2 million claim against the bond is pending, I am unable to obtain another performance bond required to do any significant construction work in California or elsewhere. My construction companies have effectively been wiped out.

54. Hal Moore also instituted foreclosure proceedings on my properties that were secured by the deeds of trust. One of those properties was a vacation home in Mammoth Lakes, California, that I purchased as an investment and leased out for ten months of the year. Not only did the foreclosure proceedings require the property to be sold in a short sale at a reduced price and in an already depressed market, leaving a $600,000 deficiency, but I lost the rental income and the future appreciation. Had Hal not done so, I could have easily kept my tenant, and continued to pay Hal Moore interest and eventual principal payments on the money owed to him.

55. As a result of the Defendants' fraudulent conduct, I was left without: (1) my 27% membership interest in the LLC, the value of which has greatly increased now that the Legacy Pointe Project has become profitable; (2) the $380,000 I drew down from my line of credit; and most importantly, (3) my ability to earn a living as a result of the bond claim.

I declare under penalties of perjury under the laws of the State of California that

the foregoing is true and correct.

Executed on December 23, 2013 at San Diego, California.

John T. Hardisty